MEUNIER v. BERNICH et al. (BALDWIN, Intervener).*

No. 16490.

Court of Appeal of Louisiana. Orleans.

Nov. 16, 1936.

*Rehearing denied Dec. 14, 1936.

Sydney J. Parlongue, of New Orleans, for defendants-appellants.

Cuthbert S. Baldwin, of New Orleans, for intervener-appellant.

J. A. Woodville, of New Orleans, for appellee.

McCALEB, Judge.

Christian J. Meunier is a claim adjuster. He conducts his business in the city of New Orleans.

On October 1, 1932, the minor child of Mr. and Mrs. Bernich was killed by a dynamite torch, commonly known as a "fusee," belonging to the New Orleans Terminal Company and used by it as a signal device in the operation of its business. Shortly after the death of the child, the said Meunier, in pursuance of his business as a claim adjuster, called upon Mr. and Mrs. Bernich, soliciting employment as their agent for the purpose of investigating, compromising or settling whatever claim they had against the party responsible for the child's death. Soon after Meunier's solicitation of business, a written contract was entered into between Mr. and Mrs. Bernich and himself whereby Meunier was employed by the Bernichs as their agent and adjuster to investigate, adjust, settle, or compromise their claim.

In order that the nature and terms of Meunier's employment may be readily understood, we quote the entire contract between the parties, which reads as follows:

"Be it known, That, the undersigned Mr. and Mrs. John A. Bernich hereby employ Christian J. Meunier, Adjuster, as Adjuster and Authorized Agent, to investigate accident wherein undersigned's minor daughter, Lotus Ann Bernich, age 2 years, was fatally injured by having been burned with a signal flare under the house at the home of undersigned at 5631 Charles Place, New Orleans, La., on October 1st, 1932 at about 6:00 P. M.; and, to enforce, secure, settle, adjust or compromise whatever claim or claims the undersigned may have arising from said fatal accident to their minor daughter Lotus Ann Bernich against the Southern Railway System, or New Orleans Great Northern Railroad or any person, firm or corporation responsible therefor; and that

"For and in consideration of the services to be rendered herein by the said Christian J. Meunier, Adjuster and in order to secure the said obligation, the undersigned does hereby assign, set over and deliver unto the said Christian J. Meunier, Adjuster a vested 33⅓% interest in said claim or claims. In event adjustment is not made and it becomes necessary for an attorney-at-law or attorneys-at-law to be employed to file suit in the premises this assignment shall then and there be automatically reduced to 25% for services in investigating and preparing the case for said handling by the said attorney or attorneys; and, it shall then and there become the duty of the said Christian J. Meunier, Adjuster to recommend whatever attorney or attorneys he may deem best fitted to successfully prosecute said suit, it not being imperative that the undersigned accept said recommendation. And, in no event, should the case be forced into suit, shall there be any greater cost to the undersigned in the handling of this case, including investigation, adjustment and trial of the case in suit, than 50% of the amount collected—it being the duty of the said Christian J. Meunier, Adjuster to recommend such attorney or attorneys who shall be willing to try the case to conclusion in all courts for not more than 25% interest in whatever amount is collected, and the duty of the said Christian J. Meunier, Adjuster to assist the said attorney or attorneys in the undersigneds' behalf in whatever investigation is necessary to a successful winning of the case."

"The said Christian J. Meunier, Adjuster has specifically held out to the undersigned that he is no lawyer, and is not to in any way engage in the practice of law in the performance of said duties; it being agreed the said case is now entirely in his hands for attention in the undersigned's behalf; and, the case shall not be compromised or discontinued without the consent of the said Christian J. Meunier, Adjuster.

"Done and signed this the 5th day of October, 1932, at the city of New Orleans, Louisiana.

"[Signed] John A. Bernich
"Father of Lotus Ann Bernich
"[Signed] Mrs. John A. Bernich
"Mother of Lotus Ann Bernich.
"Witnesses:

"The above assignment of interest and contract of employment accepted, in New Orleans, Louisiana this the 5th day of October, 1932.

"[Signed] Christian J. Meunier
Adjuster."

In accordance with the above contract of employment and pursuant thereto, Meunier, in due course, investigated the accident, and as a result of his search he ascertained that the fusee, which caused the death of the Bernich child, was the property of the New Orleans Terminal Company. Thereupon, on October 11, 1932, he made written claim against the railroad company for damages in the amount of $10,000 for the alleged negligent killing of the Bernich child, as follows:

"October 11, 1932.
"The Manager,
"Southern Railway System,
"Terminal Station,
"Canal and Basin Sts.,
"New Orleans, La.
"Dear Sir:
"I have been engaged under Contract of Employment with assignment of interest to investigate and adjust whatever claim has arisen from fatal accident to Lotus Ann Bernich, age 2 and ½ years, and accruing to the child's parents Mr. & Mrs. John A. Bernich, said accident having occurred at the child's home 5631 Charles Place which adjoins your tracks at said location, the child being burned to death by one of your railroad fusees on October 1st, 1932, at about 5:30 P. M. Said fusee was carelessly pitched, half-burned and out, practically into the backyard of the child that was killed.

"Full investigation just completed discloses that this child's death was due entirely to your wanton negligence.

"Accordingly, claim is hereby made in the full sum of $10,000.00, in the event the matter is amicably adjusted, with reservation of full rights on the part of the parents of the child should the matter be forced into litigation.

"I shall be pleased to discuss the matter with any of your claim representatives, and allow him to see what evidence my investigation has brought to light. It is asked that you give the matter your earnest attention at the earliest possible moment. Awaiting your advices, I remain,
"Yours very truly,
"CJM/B [Signed] Christian J. Meunier."

After this letter was received by the railroad, a conference was had between Meunier, as adjuster of Mr. and Mrs. Bernich, and a representative of the railroad com-

pany, which resulted in an offer being made by the latter to settle the claim for the nominal sum of $150. This offer was refused by both Meunier and Mr. and Mrs. Bernich.

Thereafter, the claim was placed in the hands of Mr. Gordon Boswell (an attorney at law practicing in New Orleans) for prosecution in the courts. Later, the case was withdrawn from Mr. Boswell's hands. It was then turned over to Mr. Maurice B. Gatlin, another practicing attorney located in New Orleans.

Suit was filed by Mr. Gatlin on behalf of Mr. and Mrs. Bernich against the New Orleans Terminal Company and judgment was awarded in favor of Mr. and Mrs. Bernich for the sum of $7,500. Shortly after the judgment was rendered, Mr. Gatlin, with the approval of Mr. and Mrs. Bernich, compromised the matter for $4,000.

Out of the proceeds of the compromise settlement, Mr. and Mrs. Bernich received 50 per cent. thereof after the deduction of minor expenses, Mr. Gatlin received 25 per cent., and Meunier claimed the residue (or 25 per cent.) which amounted to the sum of $983.19 by virtue of the above-quoted contract of employment. Mr. and Mrs. Bernich disputed the claim of Meunier, and as a consequence Mr. Gatlin deposited the money in the American Bank & Trust Company to the joint account of Mr. and Mrs. Bernich and Meunier. Later, Meunier attempted to withdraw the fund on deposit with the American Bank & Trust Company, but the bank refused payment because Mr. and Mrs. Bernich would not sign the appropriate check or draft. As a result, Meunier brought this suit against Mr. and Mrs. Bernich for the recovery of that sum, which he claims is due and owing for services rendered by him in accordance with the contract of employment.

The defendants resist liability upon the ground that the contract between the parties is illegal and against the public policy of the state, in that Meunier is practicing law without authority; that he undertook duties, by the contract of employment, which a lawyer only is able to perform; and that the court should not allow him to recover under a contract, by which he professes to be able to pursue the practice of law, in spite of the fact that he does not possess a lawyer's qualifications.

Meunier, on the other hand, insists that he is not practicing law; that he has never attempted or professed to be engaged in that profession; that the business which he pursues, viz., claim adjuster, is not the practice of law and has been specifically approved and recognized by the Legislature of the State in the passage of Act No. 202 of 1932, which defines and regulates legal practice.

The defendants concede that the business in which Meunier is engaged is exempted and excepted from the provisions of Act No. 202 of 1932, but they contend that the exception contained in the statute (upon which Meunier depends as recognition of the legality of the business he conducts) is unconstitutional, upon the ground that the Legislature is without power or right to pass any statute which encroaches upon the inherent power of the judiciary, and that when the Legislature attempted to allow persons, without legal training and not possessing a certificate of admission by the Supreme Court to practice law, to pursue the kind of business in which Meunier is engaged, it assumed power not possessed by it, because the inherent power to regulate the practice of law resides in the judiciary.

Into these proceedings, Cuthbert S. Baldwin, a practicing attorney of the city of New Orleans and chairman of the Committee on Unauthorized Practice of Law of the New Orleans Bar Association, intervened. He alleged that he and other attorneys, as officers of the court, are interested in curbing the illegal and unauthorized practice of the law by laymen; that Meunier has, for a number of years, been engaged in the practice of law as a layman by virtue of Act No. 202 of 1932; that the statute, in so far as it purports to allow laymen to engage in and pursue what is in reality the practice of law, is unconstitutional, null, and void as violative of the Constitution of the State adopted in the year 1921, particularly article 2, §§ 1 and 2, because it impinges upon the inherent right and power of the courts to regulate and control the practice of law.

After hearing the questions presented, the district judge found for the plaintiff and gave judgment in his favor as prayed for, against the defendants, Mr. and Mrs. Bernich, and dismissed the intervention of Cuthbert S. Baldwin. From this adverse judgment, both defendants and intervener, Baldwin, have appealed.

It will be observed from the foregoing that the case here submitted for our determination involves not only questions of utmost importance to the public, but also pre-

sents a grave problem concerning the inherent or implied power of the judiciary.

At the outset, we are called upon to decide whether or not the activities engaged in by Meunier constitute the practice of law in the ordinary use of the term as defined by the jurisprudence.

If we find that the business in which Meunier is engaged is that of practicing law, we then must determine which branch of our government is invested with the power to regulate the practice of law. In other words, has the Legislature power, under the general grant of police power bestowed on it by the Constitution, to prescribe the rules and regulations concerning the various acts which may or may not be considered as being the practice of law (which necessarily would confer upon it the right to define the practice of law), or, does the power to regulate the practice of law lie inherently in the judicial department of our government? If this power of regulation and control of the practice of law is possessed impliedly or inherently by the judiciary, may the Legislature, nevertheless, in the exercise of its police power, pass valid legislation in aid of the judiciary's exertion of the inherent judicial power, and may the Legislature pass legislation which is tantamount to encroachment upon or frustration of such inherent or implied judicial power?

We shall discuss these problems in their respective orders.

Ballentine's Law Dictionary defines the "practice of law" as follows: "According to the generally understood definition of the practice of law in this country, it embraces the preparation of pleadings and other papers incident to actions and special proceedings and the management of such actions and proceedings on behalf of clients before judges and courts, and, in addition, conveyancing, the preparation of legal instruments of all kinds, and, *in general, all advice to clients and all action taken for them in matters connected with the law.*" (Italics ours.)

In re Duncan, 83 S.C. 186, 65 S.E. 210, 211, 24 L.R.A.(N.S.) 750, 18 Ann.Cas. 657, the court said: "It is too obvious for discussion that the practice of law is not limited to the conduct of cases in courts. According to the generally understood definition of the practice of law in this country, it embraces the preparation of pleadings, and other papers incident to actions and special proceedings * * * on behalf of clients before judges and courts, and, in addition, conveyancing, the preparation of legal instruments of all kinds, and, in general, all advice to clients, and all action taken for them in matters connected with the law. An attorney at law is one who engages in any of these branches of the practice of law."

In Boykin v. Hopkins, 174 Ga. 511, 162 S. E. 796, 799, it was observed that: "The practice of law is not limited to the conduct of cases in court, but embraces the preparation of pleadings and other legal papers and conveyances, and the giving of advice in matters connected with the law, and includes representing a creditor in bankruptcy proceedings, or in the collection of a claim against one who has made a general assignment for the benefit of creditors."

In People v. Title Guarantee & Trust Co., 180 App.Div. 648, 168 N.Y.S. 278, 280, it was said: "The 'practice of the law,' as the term is now commonly used, embraces much more than the conduct of litigation. The greater, more responsible, and delicate part of a lawyer's work is in other directions. Drafting instruments creating trusts, formulating contracts, drawing wills and negotiations, all require legal knowledge and power of adaptation of the highest order. Beside these employments, mere skill in trying lawsuits, where ready wit and natural resources often prevail against profound knowledge of the law, is a relatively unimportant part of a lawyer's work."

The foregoing definitions embrace a broad scope of activity on the part of lawyers.

A person holding himself out to the public as being learned in the law must have a keen knowledge, derived through study and experience, of all three branches of government (viz., Legislative, Executive and Judicial). He should know how the laws are made, how they are administered, and should be able to counsel and advise the uninformed respecting the effect, interpretation, and construction of laws as laid down by the courts in the jurisprudence. Therefore, "one who practices law" may be defined to be a person who, by reason of attainments previously acquired through education and study, has been recognized by the courts of justice as possessing profound knowledge of legal science entitling him as such to advise, counsel with, protect, prosecute, or defend the rights, claims, or liabilities of his clients in respect to the construction, interpretation, and the operation and effect of law. It is for this reason that

the Supreme Court, aided by statute, has found it essential, for the protection of the general public, to prescribe certain minimum educational requirements for all applicants seeking admission to the bar. In addition to the educational standards prescribed, the court has provided, by rule 15, that the applicants for admission to practice pass a final test not only as to their learning but the court demands that the applicants be possessed of good morals and high character. The quality of integrity in the applicant to, become a member of the bar is obviously one of extreme importance inasmuch as the lawyer occupies not only a position of trust but becomes an officer of the court. His conduct in relation to his dealing with clients is subjected to close scrutiny by the other members of his profession and by the court itself and canons of ethics have been formulated as a guide to him in the pursuit of his profession. Furthermore, the right to practice law is not a privilege or immunity granted to all citizens of the United States. See In re Lockwood, 154 U.S. 116, 14 S.Ct. 1082, 38 L.Ed. 929. But it is a franchise from the state conferred only for merit and is not a lawful business except for members of the bar who have complied with all the conditions required by statute and the rules of the court. See State v. Rosborough, 152 La. 945, 94 So. 858.

The attorney at law, since the foundation of constitutional government in the United States and in the several states comprising it, has been recognized as an officer of the courts to which he has been admitted to practice. These "officers" are admitted by a court adjudication and are disbarred by court action. Our Constitution, article 7, §§ 26 and 38, grants the courts the right to appoint these "officers of the court" to sit as judges and their services as amici curiæ have often been solicited, as aids and assistants to the court, in the solving of important problems. Thus, it will be seen that lawyers occupy a position of close relationship to the judges and the courts in general.

Under modern business conditions, the lawyer of today gives the largest portion of advice to his clients within the confines of his own office. His actual appearance before the bar of the court is often limited to cases where uncompromisable conflicting opinions exist either as to the facts of the case involved, or as to the law applicable thereto. Clients need the services of the lawyer, not always for the purpose of litigation, but for advice and counsel. Before the attorney gives his opinion, he examines the jurisprudence and advises the client to the best of his ability as to the question presented. In giving this advice, he is advocating a view which he believes the court would sustain if the matter were presented to it for decision. In most instances, the client, relying upon the lawyer's skill and training in the science of his profession, adopts the attorney's opinion as the final word respecting the client's right or liability. Indeed, in such instances, the lawyer becomes the judge of the case.

Hence, for these reasons, aside from many others, the public is vitally interested in having only men of talent, ability, and learning to serve it in legal matters.

██ Let us see whether the activities pursued by Meunier constitute the practice of law. It must be borne in mind that Meunier does not claim to be a lawyer. On the contrary, he conducts his business under the style of claim adjuster and investigator, undoubtedly the investigation of a case does not necessitate the practice of law, as we understand investigation to be synonymous with detection. It is not part of a lawyer's function to ferret out evidence which may be helpful to his client in the prosecution of the client's claim. See State v. Woodville, 161 La. 125, 126, 108 So. 309. The lawyer advises upon the evidence produced by the client.

But, Meunier does more than mere investigation work. He undertook, by contract, to enforce, secure, settle, adjust, or compromise whatever claim the Bernichs had arising out of the fatal accident. In this employment, it became necessary for him to examine the facts of the case, and to advise the Bernichs regarding the liability of the New Orleans Terminal Company in damages for the death of their child. Not only did he advise the defendants that liability existed, but he made a lawyer's demand on the railroad company, informing that responsibility had attached to it for the negligent killing of the little girl.

Thus, in the performance of his contract, Meunier had to advise his client concerning the redress of a legal wrong, which advice he was not qualified to impart, because he does not possess the legal training exacted by the Supreme Court. By contracting to advise the defendants, Meunier attempted to function and perform the duties of a duly licensed attorney. He not only usurp-

ed the functions of a lawyer in this particular case, but he readily admits, on the witness stand, that in the adjustment of claims he advises clients respecting their rights and liabilities as a matter of law. In other words, he is engaged in the business of settling and adjusting personal injury claims, and it is well established that the doing of these acts constitutes the practice of law. See Fitchette et al. v. Taylor et al., 191 Minn. 582, 254 N.W. 910, 94 A.L.R. 356, and in re Opinion of the Justices (Mass.) 194 N.E. 313.

But Meunier contends that, no matter what the court understands to be the ordinary definition of the practice of law, and even though we feel that he is engaged in such practice, we are powerless to deny him recovery in this case because the Legislature has, by Act No. 202 of 1932, defined what constitutes the practice of law in this state; that the acts performed by him are not within the legislative definition and that his activities are specifically exempted or excepted from the provisions of the law. The purpose of the act relied upon (Act No. 202 of 1932) as stated in its title is "to define and regulate the practice of law; and to prescribe penalties for the violation hereof."

Section 2 of the act provides:

"That the practice of law is hereby defined as follows:

"(a) In a representative capacity, the appearance as an advocate, or the drawing of papers, pleadings or documents, or the performance of any act in connection with proceedings, pending or prospective, before any court of record in this State; or

"(b) For a consideration, reward or pecuniary benefit, present or anticipated, direct or indirect,

"(1) The advising or counseling of another as to secular law, or

"(2) In behalf of another, the drawing or procuring, or the assisting in the drawing or procuring of a paper, document or instrument affecting or relating to secular rights, or

"(3) The doing of any act, in behalf of another, tend to obtain or secure for such other the prevention or the redress of a wrong, or the enforcement or establishment of a right, *except, without resort to court proceedings, the enforcing, securing, settling, adjusting or compromising of defaulted, controverted or disputed accounts, or claims.*" (Italics ours.)

A reading of the foregoing provisions reflects the fact that the exception is repugnant to and in conflict with the general purport of the section. For, paragraph (a), § 2, speaking broadly, provides that anything that a person does in a representative capacity as an advocate "in connection with proceedings, *pending or prospective, before any court of record in this State*" is the practice of law. In face of this, paragraph (b) (3), § 2, follows with the statement that the doing of any act in behalf of another to obtain or secure the prevention or the redress of a wrong or establishment of a right is the practice of law, except that a person, not being a lawyer, can do everything that a lawyer ordinarily does provided that he will not be allowed to appear as an advocate in court. In other words, the Legislature says in one breath that everything one does on behalf of another for the purpose of redressing a wrong or for the purpose of enforcing a right, constitutes the practice of law, but notwithstanding this, one can do all of these things in a representative capacity without being a lawyer if he does not attempt to appear as counsel in court.

Counsel argues, in his brief, that the exception, which he claims has the effect of legalizing the business of Meunier, was added to the definition originally proposed when the act was introduced in the Legislature by reason of the effective opposition to and objection of the collection agencies and adjusters doing business in this state. Be this as it may, the act in its present form permits any layman to practice law in accordance with the common understanding of the term, and the only restriction placed upon such layman is that he can not appear in court and plead his client's case.

The intervener and the defendants vigorously challenge the Legislative power as to the inclusion of the exception contained in the act and they maintain that under the jurisprudence the power to regulate and define the practice of law resides with the judicial branch of the government and not with the legislative department. They concede, however, that the Legislature may enact statutes in aid of the inherent power of the court to regulate the practice of law by providing minimum requirements for candidates seeking admission to the bar, but in no event is the Legislature empowered to encroach upon or frustrate the power invested in the courts by the passage of

statutes tending to prescribe maximum requirements for those desiring to engage in the law practice. In other words, intervener and the defendants claim that only the exception contained in the statute, by virtue of which Meunier is operating his business, is unconstitutional as an impingement upon the inherent power of the judiciary, and that the balance of the statute is valid and enforcible legislation, being in aid of the implied power of the court.

The proposition advanced is not novel, but on the contrary, the courts of final jurisdiction in this and other states have had occasion, during recent years, to discuss the inherent or implied power of the judiciary and in practically all instances they have recognized that they possess and will enforce their inherent power even though the Legislature has not seen fit to expressly concede it. Ex parte Steckler, 179 La. 410, 154 So. 41, 44; State v. Harber, 129 Mo. 271, 31 S.W. 889; State ex rel. Wood v. Raynolds, 22 N.M. 1, 158 P. 413; In re Simpson, 9 N.D. 379, 83 N.W. 541; Rhode Island Bar Ass'h v. Automobile Service Ass'n, 55 R.I. 122, 179 A. 139, 100 A.L.R. 226.

This state, like most of the other states, has, by constitutional grant, distributed the power of government into three distinct departments: The Legislative, the Executive, and the Judicial, and article 2, § 2 of the Constitution of 1921 provides: "No one of these departments, nor any person or collection of persons holding office in one of them, shall exercise power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

Thus, it is seen that each department of the government is invested by the Constitution with power relating to its particular functions and that each one of them is prohibited from exercising powers which properly belong to either of the others.

The judicial powers of the courts are not defined or enumerated in the Constitution, and the courts have found that sometimes it becomes necessary for them to exert powers which were never expressly bestowed upon them by the Constitution or by statute. See City of New Orleans v. Bell, Sheriff, 14 La.Ann. 214 (Court Quarters); Ex parte Steckler, supra (control of the admission of members of the bar).

In the Steckler Case, the Supreme Court had occasion to pass upon the right of a graduate of Tulane University to practice law without being subjected to a bar examination by the court, which was provided for by Act No. 113 of 1924, and rule 15 of the Supreme Court Rules. By section 9 of Act No. 320 of 1855, it was provided that a degree of Bachelor of Laws, granted by the Board of Administrators of the University of Louisiana, shall authorize the person, on whom it is conferred, to practice law in this state. Later, Tulane University was recognized as being entitled to all of the powers and privileges granted to the University of Louisiana by the act of 1855, this recognition appearing in all of the Constitutions of Louisiana from 1879 and also appearing in section 24 of article 12 of the Constitution of 1921. It was contended by Steckler that because the constitutional amendment recognized the powers and privileges of Tulane University under the provisions of act of 1855, that he, being a graduate in good standing of Tulane University, had a right to practice law without submitting himself to the examination prescribed by rule 15 of the Supreme Court because he was protected by section 10, article 1 of the Constitution of the United States and for the court to refuse him permission to practice law would be, in effect, the impairment of the obligation of a contract between Tulane University and the State of Louisiana.

But the court held that when the Constitution recognized the Tulane Education Fund of Tulane University in place of the Board of Administrators of the University of Louisiana, that this recognition did not write into the Constitution the privilege, accorded by the act of 1855, to all graduates of the University of Louisiana to practice law. The court found that the privilege provided for in the act of 1855 was merely a legislative grant of authority subject to repeal by the Legislature at any time and that, even though this law had not been repealed, the Legislature could not, without usurping judicial functions, *"undertake to deprive the judicial department of its right to impose further conditions, in addition to such reasonable conditions as the Legislature might impose, upon the right of a person to be licensed to practice law."* The court further said:

*"It is admitted judicially—almost if not quite universally—that the prescribing of the ultimate qualifications for admission to the bar is a judicial function. The Legislature may, in the exercise of its police pow-*

er, and in the performance of its duty to protect the public against imposition or incompetence on the part of persons professing to be qualified to practice the so-called learned professions, fix minimum qualifications or standards for admission to the bar. *But the courts of justice have, besides that interest, another and special interest,* in the character and qualifications of the *members of the bar—who are considered in this country as officers of the courts.* In fact, a proper administration of justice depends as largely upon the con-science, competence and conduct of the members of the bar, as upon the work of the men on the bench. *The inherent power of the Supreme Court to admit or disbar attorneys at law may be aided and regulated by statute, but it cannot be thereby frustrated or destroyed.* In re Richards [333 Mo. 907] 63 S.W.(2d) 672. In support of the proposition that the Legislature in the exercise of its authority to fix minimum qualifications or standards for admission to the bar cannot *deprive the Supreme Court of its authority to prescribe the ultimate qualifications, of those who possess also the qualifications prescribed by the Legislature, for admission to the bar, we are referred to an appropriate and excellent opinion of the justices of the Supreme Judicial Court of Massachusetts* (1932) 279 Mass. 607, 180 N.E. 725, 81 A.L.R. 1059, and the decisions cited in the footnote, 81 A.L.R. 1063, viz.: In re Bailey, 30 Ariz. 407, 412, 413, 248 P. 29; In re Day, 181 Ill. 73, 82, 94, 54 N.E. 646, 50 L.R.A. 519; People v. People's Stock Yards State Bank, 344 Ill. 462, 470, 176 N.E. 901; Olmsted's Case, 292 Pa. 96, 103, 104, 140 A. 634; In re Leach, 134 Ind. 665, 671, 34 N.E. 641, 21 L.R.A. 701; Hanson v. Grattan, 84 Kan. 843, 845, 115 P. 646, 34 L.R.A.(N.S.) 240; In re Branch, 70 N.J.Law (41 Vroom) 537, 574, 575, 57 A. 431; In re Application of K., 88 N.J.Law, 157, 98 A. 668; In re Bruen, 102 Wash. 472, 476, 172 P. 1152; In re Application for License to Practice Law, 67 W. Va. 213, 218, 67 S.E. 597; Danforth v. Egan, 23 S.D. 43, 47, 119 N.W. 1021, 139 Am.St.Rep. 1030, 20 Ann.Cas. 418; In re Platz, 42 Utah, 439, 443, 444, 132 P. 390; In re Cannon, 206 Wis. 374, 240 N.W. 441; Ex parte Garland, 4 Wall. 333, 378, 379, 18 L.Ed. 366; Brydonjack v. State Bar, 208 Cal. 439, 443, 444, 281 P. 1018, 66 A.L.R. 1507." (Italics ours.)

Hence, it will be readily observed that our Supreme Court has recognized its inher-ent judicial power and has exerted it in the Steckler Case.

Having demonstrated the inherent power of the judiciary, the question then arises: If the Supreme Court possesses the power, irrespective of the Legislature, to determine the qualifications of those who apply for admission to practice as attorneys at law, has the Supreme Court the inherent judicial authority to define, notwithstanding legislative action, what constitutes the practice of law?

It would seem, inasmuch as the Supreme Court has declared in the Steckler Case its power and right to prescribe the ultimate qualifications for those seeking membership in the bar, that this inherent power necessarily includes the right of the court to define the practice of law.

But it is argued that the inherent power of the court to prescribe the qualifications to be possessed by lawyers is limited to the control of those applying for membership at the bar of the court and does not extend to the activities of those not attempting to practice law before the court. It is also suggested that the Legislature, under its police power, has the sole right to pass statutes governing the course of conduct of those engaged in the practice of law, and that this authority is similar to its right to prescribe requirements for those engaging in other professions, such as medicine, engineering or architecture.

We believe, however, that the argument is based upon a false premise. If the courts have the inherent power to prescribe rules and regulations for those seeking admission to the bar and if the court has the authority to discipline or disbar members of the legal profession, it follows that the scope of power residing in the judiciary embraces the right to define, by court rules, or by adjudication as cases may arise, the acts constituting the practice of law; for, if it were otherwise, the Legislature could, as it has attempted to do in this case, nullify and render ineffective the inherent judicial authority, by providing that a certain course of conduct by laymen is not the practice of law, in the face of previous adjudications by the court describing and defining the functions of the lawyer in the pursuit of his profession. Here the Legislature, by the passage of Act No. 202 of 1932, has said that a layman can perform all of the acts which are ordinarily done by a lawyer except that such layman may not appear as

an advocate in court. The exception contained in the statute is not only an encroachment upon the inherent judicial power, but it tends to impede and destroy the court's authority over the legal profession.

■ Due to the fact that courts are not empowered to enact laws, the jurisprudence has approved legislation passed in aid of the courts' inherent powers. But, while such statutes, in aid of the courts' powers, will be sanctioned, by the same token, the courts disapprove and render valueless any legislation, which has the effect of divesting or stripping its inherent power.

Examples of statutes passed in aid of the inherent power of the courts to regulate the practice of law are numerous. It is apt here to say that the Legislature of this state, following the example of many other states, by Act No. 10 of 1934, Second Extra Session, incorporated the State Bar. After the passage of that act, the Supreme Court recognized that the statute was passed in aid of the jurisdiction of the court over the bar of the state by delegating as its agent the board of governors of the state bar to fix standards for admission and to provide certain examinations and tests respecting the skill and talents of those seeking to become members of the bar. And, at the present time, any applicant having the qualifications with respect to previous education, who successfully passes the examination prescribed by the board of governors of the state bar, will be adjudicated by the Supreme Court to be entitled to pursue the legal profession.

It is therefore manifest that the Supreme Court not only possesses the inherent power to prescribe the ultimate qualifications for those who wish to engage in the practice of law, but this prerogative necessarily includes the regulation of the law practice. The Legislature may aid, by the passage of statutes, the exertion of judicial power subject to the approval of the court. And, albeit, while the Legislature may enact laws to aid the courts in protection of its inherent power, the courts will suppress and disapprove statutes, such as the exception contained in section 2, Act No. 202 of 1932, which frustrate and stultify that implied judicial authority.

In arriving at the foregoing conclusion, we feel that our views are fully fortified by the decision of the Supreme Court in the Steckler Case and also by the unanimous view of all state courts of the country which have had occasion to consider the question. See People v. Merchants' Protective Corp., 189 Cal. 531, 209 P. 363; People ex rel. Los Angeles Bar Ass'n v. California Protective Ass'n, 76 Cal.App. 354, 244 P. 1089; Boykin v. Hopkins et al., supra; In re Day, supra; Ex parte Secombe, 60 U.S. (19 How.) 9, 15 L.Ed. 565; Brydonjack v. State Bar of California, 208 Cal. 439, 281 P. 1018, 66 A.L.R. 1507; Re Eastern Idaho Loan & Trust Co. et al., 49 Idaho, 280, 288 P. 157, 73 A.L.R. 1323; People v. People's Stock Yards State Bank, Ill., 344 Ill. 462, 176 N. E. 901, 907; People ex rel. v. Association of Real Estate Tax-Payers of Ill., 354 Ill. 102, 187 N.E. 823; People ex rel. v. Motorists Ass'n of Illinois, 354 Ill. 595, 188 N.E. 827; In re Opinion of Justices, supra; Fitchette v. Taylor, supra; Land Title Abstract & Trust Co. v. Dworken et al., 129 Ohio St. 23, 193 N.E. 650; Rhode Island Bar Association v. Automobile Service Association et al., 55 R.I. 122, 179 A. 139, 142, 100 A.L.R. 226; Petition of Jacksonville Bar Ass'n (Fla.) 169 So. 674 and Givens v. Tampa Bar Ass'n et al. (Fla.) 169 So. 744.

In Boykin v. Hopkins et al., supra, the court had before it for consideration the application of persons seeking to incorporate a concern under the style and name of "Legal Services, Inc." The application was opposed by the Solicitor General of Georgia on the ground that the proposed incorporators sought to engage in the practice of law and that only natural persons could validly perform the functions of the legal profession. The court held that the law, as it existed in Georgia prior to the passage of an act of the Georgia Legislature in 1931 (Laws 1931, p. 191), precluded admission to practice law by corporations and recognized the prevailing definitions, as laid down by the jurisprudence, that the practice of law did not consist of the mere appearance in court as advocate but included a much larger scope of activity on the part of the attorney. The court further held that it was not called upon to determine the validity of the statute of Georgia defining the practice of law because the application of the incorporators was filed prior to the passage of that act but it observed that the authorities are to the effect that the Legislature may not pass statutes which encroach or impinge upon the inherent judicial power to regulate and define the law practice.

In the case of People v. People's Stock Yards State Bank, supra, the Supreme Court of Illinois held that while the Legislature had the right to pass laws prohibiting corporations from engaging in the practice of

law and subjecting corporations violating the statute to criminal penalties, nevertheless the court, by virtue of its inherent power, had the right to punish a corporation for contempt where it was found guilty of usurping the functions of the attorney at law. The court, in sustaining the right of the Legislature to pass statutes in aid of its inherent power, said: "The Legislature has not attempted to tie the hands of the courts in dealing with contempts of this kind, *and any attempt to do so would be an infringement upon the inherent exclusive jurisdiction of the courts."* (Italics ours.) And the same holding was made in People v. Association of Real Estate Tax-Payers, supra, and in People v. Motorists Association of Illinois, supra.

In the Opinion of the Justices, supra, the court, while maintaining the right of the Legislature to aid the judiciary in prescribing minimum requirements for the admission to the bar, held that: "No statute can control the judicial department in the performance of its duty to decide who shall enjoy the privilege of practicing law."

In Ohio, see Land Title Abstract & Trust Co. v. Dworken, supra, it is definitely settled that the power to admit attorneys to practice in the courts is exclusively a judicial power and not legislative.

In Rhode Island Bar Ass'n v. Automobile Service Ass'n et al., supra, the Supreme Court of Rhode Island said: "Authority to admit to the bar and to disbar necessarily carries with it power to define what constitutes the practice of the law, and to exclude unauthorized persons therefrom."

But aside from the question of the inherent power of the judiciary under the Constitution, there is, indeed, a stronger reason why the exception contained in Act No. 202 of 1932 is unconstitutional. This state, unlike most other states, has specifically granted, by article 7, § 10 of the Constitution, to the Supreme Court the exclusive original jurisdiction "in all disbarment cases involving misconduct of members of the bar, with the power to suspend or disbar under such rules as may be adopted by the court." This power to disbar necessarily carries with it authority to regulate the practice of law. It must be remembered that in the instant case we are not dealing with the inherent power of the Supreme Court to admit attorneys but are more properly considering the right of the Legislature to pass a statute which has for its avowed purpose the regulation and control of the practice of law.

Under the Constitution, the Supreme Court is given the express power to regulate the conduct of the members of the bar. When the Legislature passes a statute which attempts to define the practice of law, it directly impinges upon the constitutional grant of power bestowed upon the courts respecting the regulation of the conduct of the members of the legal profession.

If a lawyer solicits business, as Meunier has done in this case, he can be brought before the Supreme Court and tried for his misconduct in office. Meunier, however, acting in his capacity as adjuster, although, in truth, being engaged in the practice of law, is, by authority of the exception, privileged to do all things that a qualified lawyer might do in the practice of law, save appearance in court, without being subject to the discipline of or regulation by the court and wholly unrestrained by any consideration of the ethical standards of the profession. This type of statute has the effect of nullifying the power vested in the Supreme Court to punish those persons, who engage in the practice of law without a license.

We are therefore of opinion that the express constitutional grant of jurisdiction to the Supreme Court in all disbarment cases includes the right to adopt such rules, as it may deem best, defining and regulating not only the conduct of those who are attorneys at law, but also to define and regulate the acts and conduct of persons who are engaged in the unauthorized practice of law. In short, the Supreme Court, under the Constitution, article 7, § 10, is vested with specific power to define and regulate the practice of law.

Notwithstanding this express grant of power, we are also of opinion that the Legislature may, subject to the courts' approval, enact statutes in aid of the courts' powers and for this reason Act No. 202 of 1932 is constitutional with the exception of the clause relied upon by Meunier in the case at bar.

For the foregoing reasons, we find that Meunier attempted to perform the services which only an attorney at law was entitled to render and for this reason the contract was illegal and against public policy. Moreover, the clause reading as follows: "Except, without resort to court proceedings, the enforcing, securing, settling,

adjusting or compromising of defaulted, controverted or disputed accounts, or claims," contained in section 2, paragraph (b) (3) of Act No. 202 of 1932, is unconstitutional, as we find this provision to be not only an impingement upon the inherent power of the judiciary and violative of article 2, § 2 of the Constitution of Louisiana for the year 1921, but also in direct violation of article 7, § 10 of said Constitution.

We further hold that Act No. 202 of 1932, with the elimination of the above quoted clause, is valid legislation for we construe the statute as passed in aid of the Supreme Court's inherent judicial power.

Finally, counsel for Meunier persists that even though we are of opinion that the contract of employment is illegal, the plaintiff, nevertheless, is entitled to recover. It is suggested that Meunier has complied with every obligation of the contract and that the Bernichs have acknowledged and received all of its benefits; that the contract is no longer executory; that its performance has been completed and that it was entered into under the authority of the state law in good faith. It is argued that, under these circumstances, the courts have allowed recovery on illegal contracts in cases where the undertakings are not offensive to the courts' sense of decency and morals and against the public welfare.

This contention is without merit for the reason that the contract of employment is against public policy in that Meunier agreed to perform legal services without being authorized to do so by the Supreme Court. Moreover, his bargain with the Bernichs had the effect of purchasing for himself, in consideration of services which he was unable to legitimately render, a 25 per cent. interest in the outcome of a lawsuit.

It is a matter of common knowledge that attorneys customarily handling damage suits do so on a contingent fee basis. The fee of the attorney is fixed on a percentage of the amount recovered in court and in almost all cases the percentage of the attorney's interest in the outcome of the litigation is higher than that received by him in other cases because he is not compensated for his services in the event he fails to obtain a judgment. The contract of employment in the instant case limits the right of the attorney at law to receive more than 25 per cent. as a result of his success in court. This, in effect, reduces the field of talent from which the plaintiff may make his choice to those lawyers who may be willing to accept a fee smaller than is customary in such cases. In other words, Meunier contracted to keep for himself 25 per cent. of whatever judgment was obtained by the attorney who was successful in the prosecution of the Bernichs' claim. To allow him to succeed in maintaining this agreement would be to foster the solicitation of legal business and to approve the purchase of legal rights for an illegal consideration. In short, the contract offends our sense of propriety and good morals and we are therefore unable to grant recovery thereunder.

For the reasons assigned, it is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is reversed, and that the plaintiff's suit be and it is dismissed, at his costs.

Reversed.