587 So.2d 779 (1991)
STATE of Louisiana
v.
Robert KALTENBACH.
No. Cr86-1279.
Court of Appeal of Louisiana, Third Circuit.
October 2, 1991.
*780 Robert Kaltenbach, pro se.
Robin Rhodes, Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before STOKER, LABORDE and KNOLL, JJ.
STOKER, Judge.
Defendant, Robert Kaltenbach, was convicted by a six-person jury of the unlawful practice of law, a violation of LSA-R.S. 37:213. Defendant was sentenced to serve two years in the parish jail. Defendant appeals his conviction. We reverse.

FACTS
Defendant is a member and local leader of the Enlightened Patriots Association (EPA), a national organization whose motto is "Learn, Revive and Preserve Our Constitution". The EPA advocates learning and use of the common law, God's law and the United States Constitution, as opposed to civil law. Weekly meetings are held, open to the public, for discussion of the EPA's views.
EPA members do not approve of licensing attorneys or an organized Bar Association. They believe that attorneys represent clients rather than justice. They advocate use of the constitutional right to self-representation. EPA members attempt to advertise their beliefs through the use of the court system as pro se litigants. The EPA sponsors a law course, "The George Gordon School of Common Law" which purports to teach people how to represent themselves in court as pro se litigants. The course is taught from video tapes which the students rent. Study materials, including pleading forms, are also provided with the course. Additional pleadings are available to pro se litigants through use of the EPA's computer system which is headquartered in the Barrister's Inn School of Common Law in Boise, Idaho and in the Heritage Law Library in Velma, Oklahoma. The law course is available to anyone who is interested, and membership in the EPA is not required.
The EPA also believes that the only legal tender is gold or silver coins and that the currently issued paper money is only "credit money" and not real cash. The EPA has issued its own gold notes backed by its own gold and silver reserves. EPA members use gold, silver or their notes to pay for goods and services in order to make the public aware of their beliefs. Defendant organized a locally offered EPA law course on pro se litigation. The course was taught by George Gordon through video tapes. The students studied the tapes and materials and defendant assisted any student who had problems understanding the course. Defendant explained his involvement with his students' personal legal problems, and in particular those of student Vic Milliman, as follows:
"Q. Mr. Kaltenbach, have you ever prepared a pleading or an instrument that was filed into the Court record for Mr. Milliman or any other person between October 25, 1984 and August 20th, 1985?
A. I don't know. I prepare a lot of documents and give them to a lot of people, and what they do with them afterwards is their own business.
Q. Have you ever consulted with Mr. Milliman or anyone else about a legal problem, about a suit pending against that person, or any other legal issue during that same period of time?
A. Once a week we have a roundtable meeting in which there's thirty people, and we discuss everybody's suits. At that time I participate equal with others.
Q. Have you ever sat with someone one for one as you say and discussed a problem such as that?

*781 A. I'm very careful of that. I try not to get involved on a one to one relationship. I can't say I haven't done it, and I can't say that I've ever given any documents to anyone where there was not more than one person present.
Q. You can't say you haven't done that?
A. I have done it. I can't say that I have done it. I'm always
Q. So that means you can't say that you haven't done it either?
A. I can't recall where I've ever done it. Unless they come to the house and grab the documents and start copying them and take what they want.; that's the only way that I do it.
Q. Mr. Milliman has never gone to you with a question of law or procedure and said Mr. Kaltenbach, this is my problem, what can you tell me?
A. Many people do that.
Q. Did Mr. Milliman do that?
A. I'm sure Mr. Milliman did come and
Q. During that period of time?
A. and open up a book and ask questions about something in that book. I'm sure.
Q. About something that happened in the Court with him specifically during that period of time?
A. No, I don't know if he ever came to me for that reason. He would come to the meetings more or less and we would all participate in what we thought should be procedure.
Q. Mr. Kaltenbach, one more question. Did you ever make a statement to this effect: I teach a law course, or something similar to this; I teach a law course to individuals and sometimes they get out of hand and go beyond what they have learned, and I stand by to help them and assist them, prepare pleadings for them when they need to get out of trouble?
A. It's possible that I did say that. But what I mean when I say that is I stand by through my connections with the computer in Boise, Idaho and the law library in Velma, Oklahoma. I can get a document within twenty five minutes by making a phone call and hooking it up to a computer, and that document comes right straight over that computer and is dropped out for fifteen cents a page. Whether I give of my personal knowledge to solve their problems, no. I relay problems every day to the law library in Velma, Oklahoma and to the Barrister's Inn School of Common Law in Boise, Idaho; that's all I can say.
Q. That was going to be my last question. Mr. Kaltenbach, there is a semantical problem we have here. You say you teach law; what's the difference between teach law and advise as to the law, suggesting to someone, etcetera? What's the difference? Sharing knowledge. It's the same thing.
A. The Fifth Amendment of the Constitution of the United States gives a person the right to share and acquire knowledge. All right. If I'm teaching law, when I refer to teaching law, I'm teaching God's law. I don't teach man's law. I share man's knowledge, but I teach God's law. The first five books of the Bible, and all of the law is contained in those first five books. Our law course covers God's law versus man's law.
Q. So Mr. Kaltenbach, that tape we heard yesterday about you helping people prepare common law liens, that's God's law?
A. Common law liens?
Q. Yes, that's God's law?
A. I don't help people prepare a common law lien. We have a little packet which they can purchase for a donation and they can prepare their own common law liens. I'm not the originator of the common law lien. The common law lien originated in Wisconsin.
Q. And a person comes to you with a problem and says they're taking my house, I need some help, do you just give them the packet and that'sYour're done with it?
A. If somebody is losing their house, what we normally do is we give them some tapes to start listening to, first of all; and he goes home and listens to those tapes. And then he'll attend two *782 or three meetings and get into a group. And then he will see what others have done. And then a group of people will more or less lead him to do whatever he decides he wants to do. If he wants to save his house, then we have specific things that have been done all over the country that can be attempted.
Q. Mr. Kaltenbach, let's just limit it to theI don't want to know what was done all over the country. I want to know what was done with you. I'm asking you again, have you ever sat down with an individual where you would give them a course or something, or they come back with a question, and you're telling me you never told them what to do or suggested to them or shared your knowledge with them? Is that what you're telling us?
A. On a one on one basis, I'm very careful.
Q. You've never done that?
A. One on one basis, I'm not going to try to give anybody any secular advice.
Q. You've never done it with Mr. Milliman?
A. Common law or spiritual law, yes.
Q. You've never done it with Mr. Milliman?
A. Gee, I tell you, to the best of my knowledge, I can only tell you that I'm very careful not to do it. Now, whether I have never done it or not, I don't really say. If you'd give me a specific and ask me a question did I do this on such and such a date, I might be able to answer you.
* * * * * *
Q. Do they ask you questions about those problems?
A. Well, their problems are so varied.
Q. Do they ask you questions about those problems?
A. No, they'll tell me what their problem is, where can they get some help. I'll tell them to call a certain place and buy a packet, or go attend the Patriot meeting somewhere and see if they can't get some advice. If they're close to us, come to us, we'll take you in.
Q. You've never given them advice?
A. No, we don't give advice.
Q. Although you charge them $300, $500 for this legal course?
A. No, we charge for the rental of the tapes. Rental of the tapes. They pay
* * * * * *
Q. Mr. Kaltenbach, what are you doing?
A. I'm trying to tame a system that's gotten out of control. The law system.
Q. And by doing that, you're trying to tame the law system out of control, you're giving people tapes but you're not advising them or counselling them as to any action; that's what you're telling us?
A. NO AUDIBLE RESPONSE.
Q. So are you doing anything at all?
A. I'm teaching people their rights under the Constitution of the United States and the Supreme Court decisions; that's all
Q. And isn't the Constitution a law, sir? Isn't that correct?
A. It's the law.
Q. And you're teaching them the law?
A. That's right, and I'll teach that
Q. You're advising them as to the law?
A. I will teach that Constitution
Q. Are you not?
A. until the day I die.
Q. Are you not advising the people as to the law?
A. I teach the Constitution. If I'm guilty of teaching the Bible and the Constitution and you want to call it practicing law, then convict me right now because I'll do it in that jail until I die."
* * * * * *

OPINION
We find it unnecessary to address all of defendant's assignments of error. One assignment has merit and requires that we reverse defendant's conviction and sentence. The error involves the sufficiency of evidence. Therefore, we will not consider defendant's other assignments.
Defendant contends there is insufficient evidence to support his conviction of illegal *783 practice of law under LSA-R.S. 37:213. LSA-R.S. 37:213 provides:
§ 213. Persons, professional associations and professional corporations entitled to practice law; penalty for unlawful practice.
No natural person, who has not first been duly and regularly licensed and admitted to practice law by the Supreme Court of this State, no corporation or voluntary association except a professional law corporation organized pursuant to Chapter 8 of Title 12 of the Revised Statutes, and no partnership except one formed for the practice of law and composed of such natural persons and/or corporations and/or voluntary associations all of whom are duly and regularly licensed and admitted to the practice of law, shall:
(1) Practice law;
(2) Furnish attorneys or counsel or an attorney and counsel to render legal services;
(3) Hold himself or itself out to the public as being entitled to practice law;
(4) Render or furnish legal services or advice;
(5) Assume to be an attorney at law or counselor at law;
(6) Assume, use or advertise the title of lawyer, attorney, counselor, advocate or equivalent terms in any language, or any phrase containing any of these titles, in such manner as to convey the impression that he is a practitioner of law; or
(7) In any manner advertise that he, either alone or together with any other person, has, owns, conducts or maintains an office of any kind for the practice of law.
No person, partnership or corporation shall solicit employment for a legal practitioner.
This Section does not prevent any corporation or voluntary association formed for benevolent or charitable purposes and recognized by law, from furnishing an attorney at law to give free assistance to persons without means.
Any natural person who violates any provision of this Section shall be fined not more than one thousand dollars or imprisoned for not more than two years, or both.
Any partnership, corporation or voluntary association which violates this Section shall be fined not more than five thousand dollars. Every officer, trustee, director, agent, or employee of a corporation or voluntary association who, directly or indirectly, engages in any act violating any provision of this Section or assists the corporation or voluntary association in the performance of any such violation is subject to the penalties prescribed in this Section for violations by a natural person.
The "practice of law" is defined in LSA-R.S. 37:212 as follows:
§ 212. "Practice of law" defined
A. The practice of law means and includes:
(1) In a representative capacity, the appearance as an advocate, or the drawing of papers, pleadings or documents, or the performance of any act in connection with pending or prospective proceedings before any court of record in this state; or
(2) For a consideration, reward, or pecuniary benefit, present or anticipated, direct or indirect;
(a) The advising or counseling of another as to secular law;
(b) In behalf of another, the drawing or procuring, or the assisting in the drawing or procuring of a paper, document, or instrument affecting or relating to secular rights;
(c) The doing of any act, in behalf of another, tending to obtain or secure for the other the prevention or the redress of a wrong or the enforcement or establishment of a right; or
(d) Certifying or giving opinions as to title to immovable property or any interest therein or as to the rank or priority or validity of a lien, privilege or mortgage as well as the preparation of acts of sale, mortgages, credit sales or any acts or other documents passing titles to or encumbering immovable property.

*784 B. Nothing in this Section prohibits any person from attending to and caring for his own business, claims, or demands; or from preparing abstracts of title; or from insuring titles to property, movable or immovable, or an interest therein, or a privilege and encumbrance thereon, but every title insurance contract relating to immovable property must be based upon the certification or opinion of a licensed Louisiana attorney authorized to engage in the practice of law. Nothing in this Section prohibits any person from performing, as a notary public, any act necessary or incidental to the excercise of the powers and functions of the office of notary public, as those powers are delineated in Louisiana Revised Statutes of 1950, Title 35, Section 1, et seq.
C. Nothing in this Section shall prohibit any partnership, corporation, or other legal entity from asserting any claim, not exceeding two thousand dollars, or defense pertaining to an open account or promissory note, or suit for eviction of tenants on its own behalf in the courts of limited jurisdiction on its own behalf through a duly authorized partner, shareholder, officer, employee, or duly authorized agent or representative. No partnership, corporation, or other entity may assert any claim on behalf of another entity or any claim assigned to it.
D. Nothing in Article V, Section 24, of the Constitution of Louisiana or this Section shall prohibit justices or judges from performing all acts necessary or incumbent to the authorized exercise of duties as judge advocates or legal officers.
The right to practice law in the state courts is not a privilege or immunity of a citizen of the United States. It is limited to those who are licensed for that purpose, and it follows that for an unlicensed person to hold himself out as entitled to practice law is a species of fraud which the state may punish. State v. Rosborough, 152 La. 945, 94 So. 858 (1922). The supreme court possesses the power, irrespective of the legislature, to determine the qualifications of those who apply for admission to practice law. The scope of the power residing in the judiciary with respect to disciplining or disbarring attorneys embraces the right to define by court rules or by adjudication the acts constituting the practice of law. While statutes passed in aid of the court's inherent powers will be sanctioned, legislation which has the effect of divesting or stripping the court's inherent powers is unconstitutional. See Meunier v. Bernich, 170 So. 567 (La.App. Orl.Cir.1936), and its progeny.
In Meunier, the court struck down as unconstitutional a part of Act No. 202 of 1932 (predecessor to the current LSA-R.S. 37:212 and 37:213), which permitted laymen to enforce, settle, adjust, secure or compromise accounts or claims without resort to court proceedings. The court reasoned that the practice of law includes anything a person does in a representative capacity as an advocate in connection with pending or prospective proceedings. The court dismissed Meunier's suit to recover a fee for settling defendants' claims, holding the contract was null and void for violation of public policy.
It is also well-settled that a collection agency is unlawfully practicing law when it counsels clients regarding the prescription of their claims, gives any legal advice, threatens debtors with legal proceedings, or represents creditors in court, either directly or through an attorney engaged by a collector. See Pisarello v. Administrator's Service Corp., 464 So.2d 917 (La.App. 4th Cir.), writ denied, 466 So.2d 473 (La. 1985); Andrus v. Guillot, 160 So.2d 804 (La.App. 3d Cir.1964).
In Duncan v. Gordon, 476 So.2d 896 (La.App.2d Cir.1985), the court stated, "The practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client." The court held that a contingency fee contract for negotiation and settlement of a personal injury claim by a non-lawyer was null and void.
*785 Finally, in Louisiana State Bar Assoc. v. Edwins, 540 So.2d 294 (La.1989), the court upheld the defendant's conviction for, among other things, aiding his paralegal in the unauthorized practice of law, in violation of LSA-R.S. 37:212 and 37:213. The court discussed the practice of law as follows:
"DR 3-101, a rule of this court adopted pursuant to its regulatory and disciplinary powers, provides that a lawyer shall not aid a non-lawyer in the unauthorized practice of law. The accompanying Ethical Considerations, excerpted below, offer insights into the purpose and interpretation of this rule. The prohibition against the practice of law by a layman is grounded in the need of the public for integrity and competence of those who undertake to render legal services. EC 3-1. Competent professional judgment is the product of a trained familiarity with law and legal processes, a disciplined, analytical approach to legal problems, and a firm ethical commitment. EC 3-2. A non-lawyer who undertakes to handle legal matters is not governed as to integrity or legal competence by the same rules that govern the conduct of a lawyer. The Disciplinary Rules protect the public in that they prohibit a lawyer from seeking employment by improper overtures, from acting in cases of divided loyalties, and from submitting to the control of others in the exercise of his judgment. EC 3-3. It is neither necessary nor desirable to attempt the formulation of a single, specific definition of what constitutes the practice of law. Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving professional judgment. EC 3-5.
* * * * * *
"Commentators and ABA Opinions in the field have added enlightenment: The condemnation of the unauthorized practice of law is designed to protect the public from legal services by persons unskilled in the law.
* * * * *
"In defining the practice of law for purposes of interpreting DR-3-101(A), this court may consider as persuasive, but not binding, pertinent legislative expressions. La.R.S. 37:213 provides, under pain of criminal punishment, that it is unlawful for a non-lawyer to practice law, hold himself out as an attorney or advertise that he alone or jointly has an office for the practice of law. La.R.S. 37:212 defines the practice of law for this purpose as including the appearance as an advocate, the drawing of papers, pleadings or documents, the performance of any act in connection with pending or prospective proceedings before any court of record; as well as the following, if done for consideration: the advising or counseling of another as to secular law, the drawing or procuring of a paper, document or instrument affecting or relating to secular rights in behalf of another, and the doing of any act, in behalf of another, tending to obtain or secure for the other the prevention or redress of a wrong or the enforcement or establishment of a right."
540 So.2d at 299, 300.
As we have already noted, defendant is a leading member of the Enlightened Patriots Association (EPA), a national group whose philosophy is directed at learning, reviving, and preserving the Constitution of the United States. The EPA holds free public meetings to expound its philosophy and offers a videotaped law course, taught by George Gordon, entitled "Barristers in a Common Law". The course purports to instruct people how to represent themselves in court as pro se litigants. As a leading EPA member in Lafayette, defendant offered the course at the usual charge of $300.00 per student. The students watched the video tapes and *786 studied the materials provided. Defendant assisted the students with their studies.
One of the students, Vic Milliman, testified at trial on behalf of the State. His testimony was given pursuant to a plea bargain. Vic testified that he became a party in two civil suits and one criminal proceeding after taking the EPA law course. He represented himself in the two civil suits. The local EPA group assisted him in his suits by suggesting what pleadings should be filed and when. Vic stated that he used "form pleadings" from the law course materials provided by defendant which he adapted to his own cases. Defendant and other EPA members assisted Vic with his pleadings but Vic testified that, with one exception, he typed, signed and filed them himself. The one exception, which arose in the criminal proceeding, was a Motion to Recuse which was drawn up during the course of the trial by someone other than defendant at Vic's request. Vic signed and filed the motion himself. The motion was suggested by defendant and other EPA members.
The State relied heavily on the fact that Vic "donated" over $5,000 to the EPA at the time he was involved in the three lawsuits. The State contends that this donation constituted payment for legal services rendered to Vic by defendant. However, Vic testified that this "donation" was made of his own accord in appreciation for the support and assistance rendered to him by the EPA. Vic stated that he put the money in the EPA donation bucket which was always set out at EPA meetings and at the law course classes. He said that he believed that defendant took care of the donation bucket, but did not know where the money actually went. The State suggests that the money went into the defendant's own pocket, but has offered absolutely no evidence to support this suggestion.
Finally, Vic testified that, during the course of his criminal trial, he decided that he no longer wanted to represent himself and needed an attorney. According to Vic, defendant and another EPA member, Byron Taylor, took him to an attorney they knew and gave him $5,500 to pay the retainer fee. The testimony of defendant and Byron Taylor supports this story.
Vic and three other witnesses, as well as defendant, testified that defendant always emphasized that he was not a licensed attorney, that he never held himself out as such in any manner, that he never represented anyone other than himself in court and that he never signed pleadings on anyone else's behalf. The State relies on the fact that defendant calls himself a "Counsellor at Common Law". This is apparently the title which all EPA members use in their advocation of pro se litigation.
Upon viewing the evidence in the light most favorable to the prosecution, we find the evidence falls far short of that necessary to support defendant's conviction of illegal practice of law. Compare, Louisiana State Bar Ass'n v. Edwins, supra; Duncan v. Gordon, supra. The State has not shown that defendant either represented others in any pending or prospective proceedings or that defendant accepted any direct or indirect consideration for any advice or assistance given to Vic Milliman in the preparation of pleadings for his suits. Vic Milliman testified that he did not pay either defendant or the EPA for their assistance. Moreover the donation he made to the EPA was "returned" in full when defendant and Taylor provided Vic with money to retain an attorney.
The fact that defendant has assisted students in their studies in the EPA-sponsored "common law" course simply does not constitute the practice of law. Nor is the ownership of a "law library" necessarily indicative of the practice of law.
Finally, we find that defendant's title of "Counsellor at Common Law", accompanied as it always was by an explanation that he is not a licensed attorney, but is, rather, a pro se litigant, does not convey a misleading impression that defendant is an attorney. Moreover, the State failed to introduce any witness who had been misled into believing defendant is a licensed attorney.
Therefore, we reverse defendant's conviction and vacate his sentence for lack of sufficient evidence to support his conviction. *787 Defendant's other assignments of error are moot and will not be discussed.
In our holding in this case we do not wish to be understood as condoning the course of conduct of the defendant or the group which calls itself the Enlightened Patriots Association. The activities of the defendant and the EPA constitute dubious practices and, perhaps, should be discouraged. However, the proceeding in this case is a criminal proceeding and is no different from any other proceeding. The State has not proved defendant's guilt beyond a reasonable doubt, even with the benefit of such presumptions established by Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Graffagnino v. King, 436 So.2d 559 at 563 (La.1983); State v. Duncan, 420 So.2d 1105 (La.1982) and State v. Moody, 393 So.2d 1212 (La.1981). While the State may be commended for its attempt to curb what approaches a fraud on the public which may serve to mislead imminent ligitants, the State failed in this case to prove that defendant committed the crime of which he is charged.

CONCLUSION
For the reasons given, defendant's conviction and sentence are reversed and vacated. Costs of this appeal are assessed to the State.
REVERSED and VACATED.
KNOLL, J., dissents and assigns written reasons.
KNOLL, Judge, dissenting.
For the following reasons, I respectfully dissent.
In my view, the record fully supports defendant's conviction of unauthorized practice of law. The majority completely ignores the payment by Vic of $5,000 for services rendered and treats this payment as a donation to EPA. I find the payment was a fee for services rendered. That is the only reason Vic made the payment. Defendant even called himself a counsellor at common law which title, by its very definition according to Webster's New Collegiate Dictionary, is "One whose profession is to give advice in law, and manage causes for clients in court." The majority places no emphasis on defendant's title because defendant explained he was not a licensed attorney. In my view, this is an admission by defendant that he was engaging in the practice of law without a license and the crime for which he was properly convicted.