489 So.2d 928 (1986)
ANDERSON, HAWSEY & RAINACH
v.
CLEAN LAND AIR WATER CORPORATION, et al.
No. 85-CA-705.
Court of Appeal of Louisiana, Fifth Circuit.
May 12, 1986.
Writ Denied September 8, 1986.
Lemuel E. Hawsey III, Lawrence R. Anderson, Baton Rouge, for plaintiff-appellant.
Patrick W. Pendley, Plaquemine, for defendants-appellees.
Before BOWES, GRISBAUM and DUFRESNE, JJ.
GRISBAUM, Judge.
Disputed is the amount of attorney fees due a law firm. We affirm.
The defendants were members of Clean Land Air Water Corporation (CLAW) who were involved in litigation stemming from the 1978 sale of the Bayou Sorrell injection well to Rollins Environmental Services of Louisiana, Inc. The litigation primarily involved obtaining Rollins' payment of certain notes, given in the sale, in the wake of certain complaints Rollins had about defects in the well.
We are called upon to determine whether the defendants (clients), upon discharging the plaintiff law firm, fully compensated it for services rendered.
The record shows that in July 1981 the defendants first approached the plaintiff firm about representation. The firm was the fourth employed by the defendants in the matter and counsel were so informed. The firm drafted the employment contract providing for hourly rates should the contingency fee not be realized. Thereafter, they filed various suits and documents in pending suits. Settlement also was discussed. For the most part without the firm's knowledge, the CLAW members occasionally talked with Rollins representatives, usually at Rollins' instigation. Apparently a certain rapport between some of the CLAW members and some Rollins officials remained from the days when the sale had occurred. It seems that CLAW members were always willing to listen to settlement noises but had become less than optimistic that any settlement would result. The only definite outcome of the occasional contacts, except at the very end, seems to have been that a 1.8 million dollar offer was unacceptable. Mr. Lemuel E. Hawsey III, a member of the plaintiff firm, testifies that the CLAW members never indicated a figure that might be an acceptable settlement.
In April 1983, Mr. Cyril Hinds and Mr. Robert J. Meers, two members of CLAW, met with the firm to discuss a possible reduction in the contingency fee in the event a settlement for less than the face *929 amount of the outstanding notes was reached, but no agreement was reached. On May 17, 1983, Mr. Hinds personally delivered a letter dismissing the firm. On Saturday, May 21, 1983, Mr. Patrick W. Pendley, the newly hired attorney for CLAW, paid the plaintiff firm in accord with the hourly rates, plus expenses, the plaintiff had detailed on May 17. Pendley never indicated that a settlement was imminent.
Mr. Lawrence J. Thompson, of the CLAW group, testifies that settlement came about after Mr. John C. Peet, vice president, general counsel, and secretary of Rollins Environmental Services, called shortly before May 19, 1983 and set up a meeting for May 19. At this meeting, Peet first revealed the details of what would become the realized settlement. The deal's closing occurred on June 6, 1983. Thompson maintains that when Peet in March and April of 1983 recommended settlement it was good news but also a "routine" indication, it having happened before without producing settlement.
Testifying on direct on behalf of the defendants, Mr. Lawrence J. Thompson, one of the principal interest-holders in CLAW, maintains that the plaintiff firm was somewhat lax in keeping the members abreast of the case developments. In late March 1983, Thompson received one or two telephone calls from Mr. Peet but told no one else, Thompson expecting little to come of them. Prior to the May 19 meeting between some CLAW members (Gerald Hebert and Thompson) and John Peet, moreover, Thompson knew nothing of the details of the new settlement proposal. Thompson asserts there had been several prior discussions about firing the plaintiff firm. In fact in early November 1982, Hinds and Thompson went to see the plaintiffs armed with a cashier's check in the amount of $62,175, intending to fire the firm after paying them monies owed. However, they never presented the check nor broached the firing because Mr. Hawsey seemed so "fired up" and confident of their case. Not until May 16 was firing again discussed.
Mr. Cyril Hinds, a CLAW member, corroborates that dissatisfaction with the plaintiff firm had begun early on with respect to its keeping CLAW informed of developments and billings. He also corroborates the story of the abortive termination and cashier's check. Hinds says he was en route out of town and had to be located at the post office to attend the May 19 meeting with John Peet. Prior to the 19th, he did not even know Peet would be in town. Even after the May 19 meeting, Hinds had little faith a true settlement was in the offing: settlement had dematerialized too often previously.
Called on direct on behalf of the defendants, Rollins' Vice President John C. Peet detailed the history of his dealings with CLAW. As to what precipitated the settlement offer, he says that on August 2, 1982 Rollins Environmental Services became a separate corporation (vis-a-vis R.L.C. Corporation) and that in the spring (February or March) of 1983 it was decided that a public stock offering would be made. During the refinancing, Rollins wanted to "get rid of the notes" held by CLAW members. Hence, Peet made the March 1983 overture calls to Thompson. No specific figures or proposals were exchanged, however. Like the CLAW members, Peet was not sure the settlement would come about until it was closed on June 6. As to why he preferred to negotiate directly with CLAW, he states that Rollins' attorney, Mr. Wallace Hunter, had told him the plaintiff firm was "being totally unreasonable in their approach to all matters relating to negotiation." Peet is emphatic that the settlement proposal resulted not from any action by Anderson and Hawsey but instead from Rollins' desire to make a public stock offering. Pendley, too, only helped in concluding paperwork, not in bringing about a settlement.
Interpreting the sequence of events, the trial court, in its reasons for judgment, states:
This Court is convinced that the CLAW group did not know that settlement was imminent when they terminated the services *930 of the plaintiff firm. The past history of the attempts at settlement negotiations with Rollins had all been unsuccessful and the defendants believed that any future attempts would also be unsuccessful. It was not until June 6, 1983 when the settlement was entered into that the CLAW members realized that these negotiations with Rollins would be successful.
Further, when the defendants discharged the plaintiff law firm on May 17, 1983 they had not yet obtained the settlement. The settlement was not obtained until June 6, 1983.
This Court also finds that the defendants terminated the plaintiff law firm because they were dissatisfied and disillusioned with their legal representation. Mr. Thompson testified that from May, 1982 through May, 1983, the CLAW group discussed terminating the firm. On November 8, 1982 he and Mr. Cyril Hines [sic] attempted to terminate the firm but were persuaded by Mr. Hawsey to continue.
We agree.
Given the findings of the trial court, it is evident that the plaintiff law firm was fully compensated under the terms of its contract with the defendants. The record shows that the agreement between the parties contained not only the standard contingency fee language but also, in its section 6, the following clause:
6. The clients or the attorneys may terminate this agreement at any time. If there is a termination of employment before collection of any sums of money or the recovery of any property, the clients jointly, severally, and in solido agree to pay the attorneys for all of their time expended pursuant to this agreement at the attorneys['] normal and usual hourly rates for comparable work plus any unreimbursed court costs and out-of-pocket expenses. The clients acknowledge and agree that the present hourly rate of the attorneys for comparable work, as of the date of the execution of this agreement, is eighty-five ($85.00) dollars an hour for the work of Lawrence R. Anderson, Jr., Lemuel E. Hawsey III, and John C. Anderson, and seventy-five ($75.00) dollars an hour for the work of the other members of the law firm, and that the attorneys periodically adjust their rates upwards in accordance with their normal business practices.
We note the critical language in section 6 is the phrase that contains the following language: "if there is a termination of employment before collection of any sums of money or the recovery of any property, the clients jointly, severally, and in solido agree to pay the attorneys ...." The record more than adequately supports the fact that the firm had been dismissed "before collection ... or recovery of any settlement." Thus, the hourly fee provision of the contract properly applies, said provision having been complied with.
Counsel for all parties discuss at length the application vel non of Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102 (La.1979) (on rehearing), which held that, given counsel serially employed under contingent fee contracts, "only one contingency fee should be paid by the client, the amount of the fee to be determined according to the highest ethical contingency percentage to which the client contractually agreed in any of the contingency fee contracts which he executed." Id. at 118. Here, however, we have not a simple contingent fee contract but a hybridized contingent-hourly fee agreement. Given such an arrangement, we need notat least absent fraud, which is not provedfashion justice within contractual gaps but can apply the contractual provisions directly. Having written the contract and been fully compensated under its terms, the plaintiff cannot now have us redraw the agreement.
Therefore, we find the trial court had a reasonable, factual basis for its factual conclusions, and we cannot say the trial court was clearly wrong. Accordingly, the trial court did not err in awarding the plaintiff law firm its attorney fees on an hourly basis, plus expenses.
*931 For the reasons assigned, the judgment of the trial court is affirmed. All costs of this appeal are to be assessed against the appellant.
AFFIRMED.