CARAWAY, J.
Lin this dispute over the validity of an attorney-client fee contract, the clients claim that the fee contract obligated them to pay the attorneys hourly fees throughout the course of extensive litigation to recover their family’s property and mineral rights. Despite the clients’ payment of considerable hourly fees over three years during such litigation, the attorneys then elected a one-third contingency fee under the terms of an additional option extended to them in the fee contract. With this suit, the clients assert as a matter of law that the fee arrangement with the attorneys, *503 affording the optional contingency fee, violates the Louisiana Rules of Professional Conduct. They sought a partial summary judgment nullifying the one-third contingency fee provision. After the trial court’s denial of the motion for partial summary judgment, we granted supervisory review. For the following reasons, we reverse the trial court’s ruling and grant partial summary judgment.

Facts

In January of 2005, the late John C. Skannal sought legal advice from attorney John S. Odom, Jr., of the firm Jones & Odom, LLP (hereinafter “J & O”), regarding the validity of nine transactions Skan-nal had entered into with his former business partners, the Bamburgs. In March of 2005, Odom prepared a power of attorney for Skannal’s execution in favor of his son, John Barron Skannal (“Barron”), due to Skannal’s worsening health and mental decline. Thereafter, Barron and his brother, A.C. Skannal, III ^(“A.C.”),[1] visited the office of their long-time attorney, M. Carl Rice, seeking legal assistance for invalidating the same transactions.[2] Recognizing that the potential litigation was out of his area of expertise, Rice conferred with his cousin, J. Marshall Jones, Jr., also of J & O. Upon meeting Barron and A.C., Jones realized that Odom had already been consulted on the same transactions by Mr. Skannal and insisted that Odom be lead counsel. Thereafter, on March 13, 2005, Barron, individually, and as agent for his father, and A.C., individually (hereinafter “the Skannals”), entered into an “Agreement for Legal Services with Additional Contingency Fee” with J & O (hereinafter the “Fee Agreement”).[3]
The Fee Agreement forms the basis of this dispute and appeal. Paragraph II of the agreement reads as follows:
II. Client does hereby employ and retain Attorney, and Attorney does hereby bind and obligate himself to render any and all necessary legal services required hereinbelow, upon the following terms and conditions, to-wit:
A. Attorney takes into account many factors in billing services rendered and Attorney responsible will review all statements before they are issued to insure that the charge is appropriate. A principal factor is Attorney’s scheduled hourly rates, which rates currently are $200.00 per hour for partners and $75.00 per hour for legal assistants. The schedule of hourly rates is reconsidered on an annual basis with changes effective January 1. Most statements for services are simply a product of the hours worked multiplied by the hourly rate of Attorney and the legal assistant(s) performing the work. Client and Attorney expressly agree that Attorney’s hourly fee will be the |3minimum fee. Attorney’s minimum time charge is one-tenth of an hour.
B. Responsibility to provide legal services will be accepted and work will begin when Attorney receives the initial retainer of $150,000.00. The initial re *504 tainer will be placed in Attorney’s trust account and services performed and expenses advanced with be billed against that balance as appropriate on a monthly basis. When the fees and costs exceed the amount of the refundable portion of the retainer, Client will be expected to timely pay any amount due upon billing and, if requested by Attorney, Client will replenish the initial retainer fee with a like deposit. Occasionally, while the requested legal work is in progress, it might be necessary for Attorney to require an additional interim retainer. This could occur when Attorney is about to start the trial or similar large undertaking or as circumstances dictate. Attorney shall have the right to cease work and keep all funds previously earned if Client does not cooperate fully with Attorney in the handling of this matter or if Client does not make any additional deposits as may be requested by Attorney.
C. In further consideration of Attorney’s agreement to perform all necessary legal services on behalf of Client, and in recognition of the of the fact that time is of the essence in connection with the filing and prosecution of the lawsuit described in paragraph I.(A) above and completion of certain critical discovery that must be immediately commenced, all of which will require Attorney to devote significant professional time to Client’s legal affairs immediately to the exclusion of other legal work by Attorney, in addition to the aforementioned hourly fee, at the sole option of Attorney, Client agrees to pay Attorney 33.33% of any settlement made or judgment rendered after the filing of suit (whether by negotiation, mediation, compromise or otherwise), subject to Attorney’s obligation to credit back to Client all previously earned fees for work performed by Attorney in accordance with the Attorney hourly fee rate set forth in paragraph II.(A) above through execution of any judgment or completion of any settlement. Should an appeal be taken, Attorney will be compensated for all hourly work performed in connection with the appeal and the hourly fees charged for such work on any appeal shall not be subject to credit back to Client in the event the Attorney’s Earned Contingency Fee (as defined below) is accepted.
This additional fee shall be referred to as the Attorney’s Earned Contingency Fee. Attorney’s Earned Contingency Fee shall be calculated on and subtracted from the gross sum recovered. After deduction of Attorney’s Earned Contingency Fee, all expenses shall be deducted, including, but not limited to, court costs, experts’ fees, witnesses’ fees, court reporter fees and related expenses for consultants or other experts as discussed in this agreement. The | ¿balance shall be the net payable as recovery/settlement under this contract. Client and Attorney expressly understand and agree that in addition to the aforementioned hourly fee Client agrees to pay Attorney, Attorney’s optional Earned Contingency Fee for legal services detailed above may include not only monies recovered or received, but also a proportionate ownership interest in and to the immovable property, incorporeal movable property and/or incorporeal immovable property (including leasehold and/or mineral interests) relating to the Property equal to the percentage of the Attorney’s Earned Contingency Fee.
The Fee Agreement goes on to give a present assignment to J & 0 of a one-third interest in the subject matter of the suit, as permitted by La. R.S. 37:218.
*505 The Fee Agreement also contained. a severability clause and the following termination provision: “In the event that Client discharges Attorney, Client agrees that Attorney shall be due as attorney fees a pro rata share of the highest attorney’s fees that may be recognized under this Agreement.”
Skannal paid J & 0 a $150,000 retainer in accordance with the Fee Agreement. The following day, March 14, 2005, J & O instituted suit against the Bamburgs to rescind nine agreements on the grounds of incapacity and fraud.[4] In two separate opinions dated March 28, 2008 and July 31, 2008, the court nullified four of the nine transactions and awarded damages to the Skannals on the grounds of fraud.[5] The four nullified transactions included a right to sell agreement, sale of membership and stock in an LLC, and a | ^mineral deed with assignment of leases.[6] The court also awarded attorney fees of $500,000 and expert witness fees of $95,486.16.[7] Ultimately a final judgment was rendered by the court on January 13, 2009. This court substantially affirmed the judgment on January 27, 2010,[8] and the Louisiana Supreme Court denied writs on May 28, 2010.
The record shows that between March of 2005 and August of 2008, the Skannals paid J & O hourly fees totaling approximately $900,000. The Skannals admit to experiencing cash flow problems and falling behind on payments by August 8, 2008, when invoice No. 1807 was sent to them in the amount of $59,120.74.[9] On September 18, 2008, J & O sent a letter to Barron and A.C. informing them as follows:
Under the current Fee Agreement, you were required to pay our monthly statements in a timely manner subject to the right to recover those fees if and when the case was won and we opted for the one-third contingency fee. However, when you are not paying the monthly statements as submitted, we run the significant risk of in essence of never getting paid for all the work we have been doing for the past several months and all the work we will be doing between now and the trial on expert and attorney fees. That is something that we know you did not intend and do not want to see happen.
As a fair solution, we propose amending paragraph II.C. of the Fee Agreement to provide for the repayment obligation on our part up until our invoice No. 1807, dated August 18, 2007[sic](showing ■a balance as of that statement of $59,120.74), but without the repayment obligation for the balance due on that statement |f,($59,124.74) or for work done thereafter. In other words, when *506 we settle up and the royalty suspense accounts are unfrozen, you will be given credit for what you have paid related to the litigation on the invoices up to Invoice No. 1807, but for the past-due balance on that invoice, the time billed on that invoice and the time billed thereafter (up until any appeal is filed), we will get paid for our work.
Enclosed with the letter were copies of a proposed amendment to the Fee Agreement (hereinafter “Amendment”) which was finalized by the parties on October 9, 2008. The Amendment changed the first paragraph of II.(C) of the original Fee Agreement to add the following language:
[Ejxcept that the amounts for legal services due as shown on Attorneys’ Invoice Number 1807, dated August 18, 2008 (including any then past-due amounts), and work performed thereafter shall be payable from the proceeds of any recovery obtained, including funds payable from the release of any mineral royalties held in suspense during the pendency of the litigation, without the obligation on the part of Attorneys to reimburse the amounts shown on Invoice Number 1807 and subsequent invoices in the event the Attorney’s Earned Contingency Fee (as defined below) is accepted.
Otherwise, the contingency fee option as originally expressed in 2005 remained the same.
By June of 2009, an appeal of Skannal I was granted.[10] In July of 2009, J & O had submitted a Fee Disbursement Agreement [11] to the Skannals which was signed by them on July 23, 2009. The Fee Disbursement Agreement clearly stated for the first time that, “Attorneys hereby claim the Attorney’s Earned Contingency Fee.”[12]
|7The Fee Disbursement Agreement calculated J & O’s contingency fee as a total of 33.33% of the $902,801.66 ($300,903.79) money judgment; in addition, a 33.33% share of “all the funds received from the various oil and gas companies” that were held in suspense since November 12, 2005; plus 33.33% of “future oil and gas revenues attributable to the interests of John C. Skannal” recovered as a result of Skan-nal 7; and 33.33% of the stock of the company and membership interest in an L.L.C. recovered as the result of the suit. Further, in addition to the contingency fee matter calculated above, the Fee Disbursement Agreement stated that “the repayment obligation of Attorneys shall be fulfilled by Client taking a credit against the Attorneys’ 33.33% share of the oil and gas reserves previously held in suspense.” Additionally, J & O sought “out of the proceeds of the oil and gas revenues previously held in suspense,” the sum of $59,075.74, $26,987.71, and $56,418.99, which were the amounts of unpaid invoices Nos. 1807, 2009, and 2639, for a total of $142,482.44. The Fee Disbursement Agreement also indicated that fees related to the appeal of Skannal I would be “han- *507 died on the basis of an hourly charge of $200.00” and provided that the Skannals agreed to remit payment for “such future invoices.” The parties agreed to split the costs of title examinations concerning the recovered mineral rights at 2/3 for the Skannals and 1/3 for Attorneys.
J & O had begun contacting oil and gas companies in the summer of 2009 to remit suspended royalties. By August 18, 2009, J-W Operating Company paid $1,139,136.11 to the Skannal Succession and on August 31, | s2009, Chesapeake remitted $1,108,480.29 directly to Barron. After Chesapeake’s payment, the Skannals forwarded J & O payment of $142,482.22 in hourly fees and expenses, representing the past due invoices.
Nevertheless, on September 18, 2009, the Skannals instituted this suit against J & O. Specifically, the Skannals alleged that they had paid “the Firm over $1,000,000 in legal fees, costs and expenses” as of the date of the petition and were “current in their payments on Firm invoices.” The Skannals challenged the validity of the contingency fee provisions of the Fee Agreement, asserting that the agreement “did not require [J & O] to bear any risk of loss in exchange for the contingency fees.” The Skannals requested a declaration of their rights with respect to “the validity and enforceability” of all three agreements “to the extent they purport to provide for and require payment of a contingency fee,” and were “unreasonable, excessive and unearned.” Further, the Skannals argued that J & O improperly took an interest in the subject matter of the lawsuit. On July 7, 2010, Rice filed a petition of intervention naming the Skan-nals and J & O as defendants and seeking payment of “a contingent attorney’s fee” due him.
On March 29, 2011, the Skannals filed a motion for partial summary judgment wherein they sought a judgment declaring the contingency fee option invalid and unenforceable and annulling and rescinding the Fee Agreement. The Skannals argued that under Louisiana Rule of Professional Conduct 1.5(c) (hereinafter “Rule 1.5(c)”), the contingency fee in this case was invalid on its face.
|9In support of the partial summary judgment, the affidavit of Barron conceded that he signed both the Fee Agreement and the 2008 Amendment. Barron stated that between March of 2005 and August of 2008, the Skannals paid the firm more than $800,000 in hourly fees and that in July 23, 2009, J & O claimed the contingency fee by executing the Fee Disbursement Agreement. The three referenced documents and the September 18, 2008 letter from J & O to Barron and A.C. were attached to Barron’s affidavit.
J & O opposed the partial summary judgment, arguing that the issue of the risk of the outcome of the matter was fact based, which must be evaluated in terms of the reasonableness of the firm’s fee under Louisiana Rule of Professional Conduct 1.5(a) and was inappropriate for summary judgment. J & O characterized the Fee Agreement as a hybrid contract, which was “negotiated in an arm’s length transaction with the Skannals receiving and relying on the advice of independent counsel, Carl Rice.” J & O argued that the firm “risked a multitude of possible losses” that “became a colossal risk,” especially upon the Skannals’ failure to pay hourly fees.
The affidavits of Odom and Jones were filed by J & O in its opposition to the motion for partial summary judgment. The attorneys testified that their hourly rate for litigation services was $250-$275 and not the $200 rate employed in the Fee Agreement. Regarding the selection of the 33.33% contingency, Odom stated that J & O had initially sought the higher per *508 centage of 40%, but had reduced the optional contingency in the | ^negotiations for the Fee Agreement. The lawyers asserted that in those negotiations for the contract, Rice acted on behalf of the Skannals.
The affidavits also discussed the events of 2008 when the Skannals became delinquent in paying the invoiced fees. After the trial court’s initial ruling in 2008, Rice asked for J & O to stop sending monthly bills because the Skannals “were broke.” This led to Odom’s letter proposing the Amendment to the Fee Agreement. Regarding the parties’ execution of the Fee Disbursement Agreement in the summer of 2009, Odom’s affidavit indicates that the firm expected to receive its $300,903.79 share of the money judgment and that the “credit back” of the previously paid invoiced fees would be accounted for out of the suspended royalties. J & O was to seek a court order in the Skannal Succession authorizing payment of those fees.
Odom also reported that in July of 2009, J & O filed a second lawsuit against the Bamburgs on behalf of the Skannals. In that connection, he received an email from Barron, in which Barron stated that “you’re entitled to 1/3 of the minerals and Sligo Hills both, so don’t you agree as part owner that we need to stay after Bamburg and keep the heat on.”
At the conclusion of the hearing on the motion for partial summary judgment, the trial court denied the motion on October 9, 2012. The court found “many disputed facts” but stated “[wjhether or not they are pertinent as to the legality of the contract or that clause of the contract is not clear as a matter of law.” Thereafter, this court granted a supervisory writ of review Into consider the Skannals’ claim of nullity of the contingency fee option of the Fee Agreement.

Louisiana’s Regulation of Attorney-Client Fee Contracts

The Louisiana Supreme Court explained its powers to regulate the practice of law in Succession of Wallace, 574 So.2d 348 (La.1991), as follows:
This court has exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the bar, the professional responsibility and conduct of lawyers, the discipline, suspension and disbarment of lawyers, and the client-attorney relationship. LSBA v. Edwins, 540 So.2d 294 (La.1989); Saucier v. Hayes Dairy Products, Inc., 373 So.2d 102, 109, 115 (La.197[8]); LSBA v. Connolly, 201 La. 342, 9 So.2d 582 (1942); Ex Parte Steckler, 179 La. 410, 154 So. 41 (1934); Meunier v. Bernich, 170 So. 567 (La.App.1936). The sources of this power are this court’s inherent judicial power emanating from the constitutional separation of powers, La. Const.1974, Art. II; Saucier v. Hayes Dairy Products, Inc., supra; Ex Parte Steckler, supra; Meunier v. Bernich, supra, the traditional inherent and essential function of attorneys as officers of the courts, Ex Parte Steckler, supra; Meunier v. Bernich, supra; and this court’s exclusive original jurisdiction of attorney disciplinary proceedings. La. Const.1974, Art. V, § 5(B); Saucier v. Hayes Dairy Products, Inc., supra. The standards governing the conduct of attorneys by rules of this court unquestionably have the force and effect of substantive law. Succession of Cloud, 530 So.2d 1146 (La.1988); Succession of Boyenga, 437 So.2d 260 (La.1983); Leenerts Farm [Farms], Inc. v. Rogers, 421 So.2d 216 (La.1982); Singer, Hunter [Hutner], Levine, Seeman & Stuart v. LSBA, 378 So.2d 423, 426 (La.1979); Saucier v. Hayes Dairy Products, Inc., *509 supra; LSBA v. Connolly, supra; Ex Parte Steckler, supra.
Thus, under its inherent judicial power and its original jurisdiction, the Supreme Court of Louisiana has exclusive authority to regulate the practice of law in this state. La. Const, art. V, § 5(B); O’Rourke v. Cairns, 95-3054 (La.11/25/96), 683 So.2d 697; Mire v. City of Lake Charles, 540 So.2d 950 (La.1989). This broad grant of regulatory power includes the responsibility to exert control by adjudicatory means of individual cases as |12they arise, including those relative to discharge of counsel and regulation of fees, whether by contingency contract or otherwise. Saucier, supra.
Although the basic relationship between client and lawyer may be contractual, that association is nonetheless subject to the inherent authority of the Louisiana Supreme Court to positively affect that fiduciary relationship through its power to regulate the practice of law. Chittenden v. State Farm Mut. Auto. Ins. Co., 00-0414 (La.5/15/01), 788 So.2d 1140. Therefore, any dispute relative to an attorney-client relationship is subject to the close scrutiny of the Louisiana Supreme Court and is resolved under the codal provisions as illuminated by the Louisiana Rules of Professional Conduct. Id. Additionally, this court has stated that the Rules of Professional Conduct require “a thorough ‘education’ of a client by his or her lawyer about the fee and an explanation of why the lawyer recommended to the client the particular fee arrangement to the exclusion of other fee arrangements.” Watson v. Cook, 616 So.2d 803 (La.App. 2d Cir.1993), writs denied, 619 So.2d 579 (La.1993).
Louisiana Rules of Professional Conduct 1.5(a) and (c) regarding fees provide as follows:
(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
|iq(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent. '
[[Image here]]
(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by Paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client. A copy or duplicate original of the executed agreement shall be given to the client at the time of execution of the agreement. The contingency fee agreement shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; the litigation and other expenses that are to be deducted from the recov *510 ery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the client will be liable whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a •written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.
Louisiana courts have long approved of the contingent fee contract to compensate attorneys. O’Rourke, supra. The Louisiana Supreme Court has defined a contingent fee contract as a contract for legal services in which the attorney’s fee depends upon success in the enforcement of the client’s claim. The attorney bears the risk of loss insofar as his legal services are concerned. Such contracts promote the distribution of needed legal services by reducing the risk of financial loss to clients and making legal services available to those without means. Saucier, supra. The Louisiana Supreme Court has stated that it views “the Code of Professional Responsibility as |14being the most exacting of laws established for the public good.” Leenerts Farms, supra.

Discussion

The Skannals argue that the Fee Agreement expressly assured J & 0 complete compensation earned under the firm’s current and scheduled hourly rates upon its rendering of legal services throughout the litigation even if the Skan-nals lost the litigation. Therefore, the additional optional compensation provided by the one-third contingency was not “contingent on the outcome of the matter for which the service was rendered” in violation of Rule 1.5(c). Relying on the face of the contract alone, the Skannals assert that J & 0 was granted the unilateral option to elect the contingency fee at any time during the course of the litigation, thus allowing it to retain its guaranteed fixed fee arrangement until such time that the risk of the litigation had significantly diminished or ended. As a matter of law, on the face of the parties’ contract, the Skannals seek summary judgment for the nullity of the contingency fee provision.
To the contrary, J & 0 disputes that view of the Fee Agreement, asserting that the affidavits of Odom and Jones raise material fact issues[13] regarding the intended meaning and operation of the Fee Agreement. J & 0 summarizes its view of the contract in its brief, as follows:
|1B(1) Jones Odom’s option was not exercisable “at any time during the representation;” and (2) electing Jones Odom’s option required the Firm to pay back all hourly fees collected, thereby converting the fee arrangement to a true contingency where the effect of losing its judgment during the appellate process would have resulted in over four years of tireless work and collection of zero fees.
*511 Although various issues of material fact are asserted by J & 0, from our review of the record it is undisputed that between March 2005 and the August 2008 firm billing for Invoice No. 1807, the Skannals had paid J & O approximately $900,000, representing “earned fees” under the Fee Agreement for the firm’s legal services. Prior to the billing for Invoice No. 1807, J & O had never expressly exercised its option for the contingency fee. By August of 2008, the trial of Skannal I had occurred and the trial judge had rendered his rulings rescinding the Bamburg contracts and assessing damages for fraud.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party. La. C.C. art. 2056.
The determination of whether a contract is clear or ambiguous is a matter of law. Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.3d 1145; Town of Haynesville, Inc. v. Entergy Corp., 42,019 (La.App.2d Cir.5/2/07), 956 So.2d 192, writ denied, 07-1172 (La.9/21/07), 964 So.2d 334. Ambiguity exists as to the parties’ intent when the | ^contract lacks a provision on the issue or when the language of the contract is uncertain or fairly susceptible to more than one interpretation. Stephenson, supra; Rogers v. Horseshoe Entertainment, 32,-800 (La.App.2d Cir.8/1/00), 766 So.2d 595, writs denied, 00-2894 (La.12/8/00), 776 So.2d 463, 00-2905 (La.12/8/00), 776 So.2d 464.
Testimonial or other evidence may not be admitted to negate or vary the contents of an authentic act or an act under private signature. Nevertheless, in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent or to prove that the written act was modified by a subsequent and valid oral agreement. La. C.C. art. 1848.
Parties are free to contract for any object that is lawful, possible, and determined or determinable. La. C.C. art. 1971. This “freedom of contract” signifies that parties to an agreement have the right and power to construct' their own bargains. However, the state may legitimately restrict the parties’ right to contract if the proposed bargain is found to have some deleterious effect on the public or to contravene some other matter of public policy. Therefore, in a free enterprise system, parties are free to contract except for those instances where the government places restrictions for reasons of public policy. Family Care Services, Inc. v. Owens, 45,505 (La.App.2d Cir.8/11/10), 46 So.3d 234.
A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed. Absolute nullity may be invoked by | i7any person or may be declared by the court on its own initiative. La. C.C. art. 2030.
Reviewing the parties’ contract under these principles, we find that the Fee Agreement unambiguously set forth a fixed-fee arrangement for J & O’s compensation, providing obligatory fees during the time the firm’s services accrued throughout the litigation and irrespective of the outcome of the suit. In that connection, the clear language of the contract does not support J & O’s assertion that upon the election of the contingency option the firm *512 became obligated to pay back its earned fees, in this case approximately $900,000, and be subject to the possibility after August of 2008 of receiving “zero fees” if the trial court’s judgment was reversed on appeal. The $900,000 in fees was not paid back to the Skannals in the summer of 2008. Because of the close scrutiny applicable to fee contracts for regulation of the attorney-client relationship, it would not be “in the interest of justice” to admit the attorneys’ parol evidence to vary the content of the Fee Agreement so as to alter the contractual intent expressed in their written contract prepared for their clients as the operative fee arrangement. La. C.C. art. 1848.
The language of paragraph II.(C) of the Fee Agreement provides that the contingency would be “in addition to the aforementioned hourly fee.” The contingent fee which J & O could elect was one-third of the “gross sum recovered.” Out of the firm’s portion of the assets recovered and damages received in the litigation, the Skannals would receive a “credit back” for the firm’s prior earned fees.
11sRule 1.5(c) suggests a risk assessment of the outcome of the matter at the inception of the fee arrangement. Instead, with this disputed discretionary option exercisable by J & O long after the fee engagement and filing of suit, J & O could gauge the amount of its earned legal fees received throughout the course of the litigation while continuously assessing the size or value and the possibility of recovery. Such weighing of the values in dispute and the consideration of the likely outcome could extend throughout the course of the litigation before the firm’s election was required. In particular, the language first providing the firm’s option describes the resulting “credit back” right of the Clients as extending to “all previously earned fees for work performed ... through execution of any judgment.” The execution of judgment phase of any litigation is usually after the finality of a favorable judgment. Thus, fees could be earned in that phase and credited back against the contingency fee elected thereafter by the firm.
With this determination of the operation of the clear language of the parties’ contract, we find that public policy for the regulation of the attorney-client fee relationship was violated upon the execution of the Fee Agreement in 2005. Such policy violation concerns the underlying premise of reasonableness reflected in subsection (c) of Rule 1.5 and specifically addressed in subsection (a). In the usual setting, with the risk of the outcome of the matter present and measurable upon entering a fee contract, the total benefit to the attorney from the contingency may extend well beyond the maximum reasonable fee the attorney could otherwise obtain by imposing a fixed-fee obligation on the client from the start. Nevertheless, in 119this case, J & O prepared the contract for their clients with the contingency option as an additional contractual benefit to the firm over and beyond its fixed-fee benefits for which the Skannals were obligated. The contingency fee option did not expressly provide a stipulated time for its execution. The anticipated suit against the Bamburgs was to seek a money judgment against them in addition to the return of mineral rights and other assets. Therefore, the Fee Agreement suggests by its language an allowance for the election of the firm’s option even after the finality of judgment “through execution of any judgment.” At such stage of a legal dispute, “the outcome of the matter” can no longer be said to involve such contingent risk to allow for the sizeable one-third contingency fee out of the subject matter of the attorney-client representation. Thus, J & O’s open-ended option in this case does not fall, in our opinion, within the allowance for a contin *513 gent fee under Rule 1.5(c) when, under the other fee arrangement of the contract, the client was obligated throughout the risky course of the dispute for fixed fees that reasonably compensated J & 0 for its services.
Our policy concerns over the format of this Fee Arrangement as executed by the clients in 2005 have been reflected in the various commentaries for the' rules of ethics. For example, reviewing-the parallel American Bar Association model rules for contingency fees, one commentator observed:
The ethical justification for these approvals [of contingency fees] necessarily lies in the assumption that the lawyer’s risk of receiving no fee, or a fee that effectively will be well below her normal hourly rate or opportunity cost, merits compensation in and of itself:. Bearing the risk entitles the lawyer to a commensurate risk premium. Conversely, a lawyer not bearing risk cannot charge a risk premium. 120Therefore, a lawyer who charges a substantial risk premium in the form of a standard contingency fee in a case without meaningful fee risk is charging both an illegal and an unethical fee.
Lester Brickman, ABA Regulation of Contingency Fees: Money Talks, Ethics Walks, 65 Fordham L.Rev. 247, 271 (1996).
The inclusion of the “contingent” fee within the criteria for the measure of reasonableness under Rule 1.5(a), prompted the following observation:
Charging a contingent fee grossly disproportionate to any realistic risk of non-recovery would amount to charging a “clearly excessive” fee. The Model Code lists eight “factors to be considered as guides in determining the reasonableness of a fee,” including “whether the fee is fixed or contingent.” The only sensible interpretation of this latter factor, set forth in Disciplinary Rule 2-106(B)(8) and Model Rule 1.5(a)(8), is that for a contingent fee to be reasonable and therefore not “clearly excessive,” the lawyer must bear some risk of nonrecovery. Any other interpretation would result in an absurdity. If a lawyer could ethically charge a contingent fee absent any realistic risk of nonrecov-ery, then the fact that he charged, a contingent fee and thereby raised his fee beyond what a fixed fee would have yielded would be regarded as a factor attesting to the reasonableness of the fee.
Lester Brickman, Contingent Fees Without Contingencies: Hamlet Without the Prince of Denmark?, 37 UCLA L.Rev. 29, 71-72 (1989).
J & O argues that these policy issues are, nevertheless, not implicated because the Fee Agreement must be considered as a so-called hybrid fee contract. The Louisiana Supreme Court has not addressed the allowance for any hybrid contingency/hourly fee contracts which might be permissible under our Rules of Professional Conduct. See, In Re Gaston, 11-0390 (La.7/1/11), 65 So.3d 1239, and In re Curry, 08-2557 (La.7/1/09), 16 So.3d 1139. Only two Louisiana appellate cases have approved of a form of hybrid contingency fee agreements. The context of the disputed fee 12iagreements in those cases, however, involved contractual provisions converting from a contingency to an hourly fee obligation upon the client’s discharge of the attorney. Gilbert v. Evan, 01-1090 (La.App.1st Cir.6/21/02), 822 So.2d 42, writ denied, 02-1903 (La.10/25/02), 827 So.2d 1154; Anderson, Hawsey & Rainach v. Clean Land Air Water Corp., 489 So.2d 928 (La.App. 5th Cir.1986), writ denied, 492 So.2d 1221 (La.1986). These cases are therefore clearly distinguishable.
*514 in Wythe II Corp. v. Stone, 842 S.W.3d 96 (Tex.App.-Beaumont 2011), cert denied, — U.S. -, 132 S.Ct. 1150, 181 L.Ed.2d 1020 (2012), the Texas intermediate court of appeal made statements in dicta objecting to any allowance for a fee contract with an attorney’s similar unilateral option of conversion to a contingency fee. While the actual fee contract in Wythe, as approved by a bankruptcy court, did not include any conversion option, the Texas court observed:
If the attorney could earn a reasonable fee on an hourly basis until recovery is assured and the work complete, but later exercise a unilateral option to collect a percentage of the client’s recovery, the fee would no longer be “contingent” on anything-in effect, the client could be required to pay regardless of recovery.
Other jurisdictions recognize contingency fee contracts which combine both substantially reduced hourly and contingency fee rates including those cases cited by J & O in brief. See, State, Public Employees Retirement Bd. v. Cacioppo, 813 P.2d 679 (Alaska 1991); Cotchett, Pitre & McCarthy v. Universal Paragon Corp., 187 Cal.App.4th 1405, 114 Cal.Rptr.3d 781 (App.Ct.2010); In re Market Center East Retail Property Inc., 469 B.R. 44, 67 Collier Bankr.Cas.2d 566 (10th Cir. BAP 2012). Seejagalso, Marketfare Annunciation, LLC v. United Fire & Cas. Co., 2009 WL 3672758 (E.D.La.2009); Anal v. Travelers Property Cas. Ins. Co., 2007 WL 1412492 (D.Ariz.2007). J & O argues that these cases demonstrate that the Rules of Professional Conduct do not prohibit the combination of a fixed fee obligation upon a client and a contingent fee component in a hybrid fee contract. From our review of this national jurisprudence, we find that the courts in these cases addressed attorney-client contracts with pronounced differences from the Fee Agreement.
Most importantly, in these hybrid settings, the balance between the client’s obligation to pay a lower hourly rate and the reduced percentage of the additional contingent reward is struck upon inception of the fee arrangement. This “hybrid” balance results from the parties’ evaluation of the risk of the “outcome of the matter” and the contingent fee percentage is then fixed by the client’s informed consent. Here, J & O claims a convertible fee arrangement that remained optionally available for the attorney’s evaluation alone for over three years, post trial on the merits.
Second, this written contract now claimed as a “hybrid” by J & O did not inform the client that both the hourly fees to be charged and the percentage of the contingency were reduced. Here again, the option element as expressed in the Fee Agreement suggests to the contrary that either fee, the hourly payments or the one-third contingency, would fully compensate J & O for its services. The Skannals were expressly informed by the agreement that the firm’s “scheduled hourly charges” would be charged, not reduced billing rates. We likewise find that a one-third contingency for this | ^litigation cannot be viewed as a less than typical contingency fee and significantly reduced. From the language of the Fee Agreement, the contingency fee option was said to be provided “in addition to the aforementioned hourly fee” because of the pressing time constraints placed on J & O by the litigation, not because the firm had significantly reduced its hourly fees.
Third, the analyses in some of the hybrid cases noted the clients’ concerns and possible inabilities for payment of the attorney’s regular hourly rates. This allowed the client to negotiate a lower hourly rate while at the same time, in exchange, allowing the attorney a reduced contingency award as an additional bene *515 fit. In this ease, the Skannals were able to pay an initial $150,000 retainer and paid J & O continuous billings up to almost $900,000 throughout the litigation phase to judgment before problems arose. The Skannals therefore entered the contract demonstrating their immediate and substantial financial ability to pay the firm’s scheduled hourly rates.
Thus, in summary, while we need not express our opinion over the possible use of hybrid fee arrangements in Louisiana, this Fee Agreement with J & O’s unilateral option is clearly distinguishable from those reduced fee/contingent contracts sanctioned in the cited jurisprudence. As a matter of law, the Fee Agreement violated public policy by effectively eliminating the risk of the “outcome of the matter” under Rule 1.5(c). The SkannalsJ^fully obligated themselves to a fair and reasonable fixed fee arrangement in 2005, and J & O’s one-third contingency fee option was a nullity.[14]
Finally, we further address certain fact disputes and other assertions whereby J & O argues genuine issues of material fact. J & O emphasizes that after Mr. Skannal’s death, the inheritance taxes, the liquidity of the estate and any possible repayment obligation the Skannals might owe the Bamburgs were great risks extending into 2008-2009. Thus, J & O argues that even with success in the Bamburg litigation, there was a great risk that “the Skannals would have been ‘rich’ in assets and ‘poor’ in cash and the likelihood that J & O would have recouped any fee for its four years of work would have been very slim.” This depiction of the situation ignores the fact that through the August 2008 invoice, J & O had received “earned fees” of almost $900,000 for well over three years for the bulk of the litigation services. Those “earned fees,” as held above, were not contingent payments that J & O might be obligated to repay upon reversal of the trial court judgments on appeal. Moreover, the risk of insolvency of a client under a fixed fee arrangement is an inherent risk in such contracts. If J & O believed that it would not be paid its fixed fees after August 2008, the Rules of Professional Conduct allow for the possible ending of representation. Louisiana Rule of Professional Conduct 1.16.
Likewise, the two additional acts which the Skannals executed in 2008 and 2009, the Amendment and the Fee Disbursement Agreement, do not create material fact issues regarding the nullity of the contingency fee | ^provision of the Fee Agreement. In both agreements, the one-third optional contingency of the initial contract was acknowledged by the Skan-nals. Yet, an absolutely null provision of a contract in violation of public policy may not be confirmed. La. C.C. arts.2030 and 1842. Those two agreements prepared by the attorneys for the clients cannot provide J & O with the very same fee which was a nullity from the start.
Last, although J & O’s brief repeatedly references Rice’s participation as “independent counsel” for the Skannals, the public policy prohibition of this fee arrangement for the protection of an attorney’s clients does not become less absolute in its nullifying effect because of another lawyer’s advice. Rice’s agreement for a sharing of the one-third contingency with J & O, which was entered on the same day in 2005 as the Fee Agreement, hardly allows his participation in the matter to be considered independent.
Conclusion
For the foregoing reasons, we grant the Skannals’ partial summary judgment. The *516 contingency fee option provision of the Fee Agreement is hereby declared a nullity. The judgment of the trial court is reversed. Costs of this appeal are assessed to J <& 0.
JUDGMENT REVERSED; PARTIAL SUMMARY JUDGMENT GRANTED; REMANDED FOR FURTHER PROCEEDINGS.

. Skannal also had a daughter, Elizabeth Skannal, who signed subsequent documents.

. Skannal’s questionable mental capacity and the Bamburgs’ sway over his decisions were the cause for the alleged invalidity of the business transactions.

. The record shows that Rice witnessed the Skannals' Fee Agreement with J & O and that Rice and J & O entered into a Consultancy Agreement for consulting fees of 1/9 of the earned contingency fee from the suit on that same day. Rice later entered in to an additional 3% contingency fee agreement with A.C., individually, and Barron, individually, as executor for Skannal's succession and Trustee of the John C. Skannal Trust on July 24, 2009.

. When Skannal died in November of 2005, his succession was substituted as plaintiff.

. A complete synopsis of the facts, legal arguments and ultimate resolution of the issues involved in that litigation can be found in our earlier opinion of Skannal v. Bamburg, 44,820 (La.App.2d Cir. 1/27/10), 33 So.3d 227, writ denied, 10-0707 (La.5/28/10), 36 So.3d 254. (hereinafter, “Skannal I”).

. During Skannal I, royalty payments of approximately $2.2 million were held in suspense by operators pending a determination of ownership of the mineral rights.

. J & O argues that Skannal I involved $948,103.46 in attorney fees and $201,225.89 in expert witness fees.

. The appeal judgment modified a trial court's order to delete the defendant's obligation to pay 1/2 of a real estate commission for the sale of certain lots.

. The affidavit of J & O’s business manager submitted to the trial court in Skannal' I for the setting of ' attorney fees shows that $895,448 had been billed by and paid to the firm. Invoice No. 1807 was not listed in her report.

. The originally filed suspensive appeal was converted to a devolutive appeal in August of 2009.

. Louisiana Rule of Professional Conduct 1.5(c) requires that upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

.The exact date that the option for the contingency was exercised is elusive. In its re-conventional demand, J & O alleges that it exercised its option in June 2009. Odom’s and Jones' affidavits indicate that the option was exercised "more than a year prior” to the execution of the Fee Disbursement Agreement in July of 2009. In brief, J & O's counsel indicates that the firm exercised the option in September of 2008.

. Upon a motion for summary judgment, the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law. La. C.C.P. 966(B)(2). A fact is material if it potentially ensures or precludes recovery, affects a litigant’s ultimate success, or determines the outcome of the legal dispute. A genuine issue of material fact is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and summary judgment is appropriate. King v. Illinois Nat. Ins. Co., 08-1491 (La.4/3/09), 9 So.3d 780.

. La. C.C. art. 2034 provides for the partial nullity of a contract provision.